## Commonwealth ex rel. Johnson, Appellant, v. Dye.

Argued September 30, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Samuel J. Goldstein,* with him *Marjorie Hanson Matson* and *Hymen Schlesinger,* for appellant.

*Louis L. Kaufman,* with him *Artemas C. Leslie,* District Attorney, for appellee.

OPINION BY ARNOLD, J., October 30, 1946:

Leon Johnson was indicted in the Cobb County Superior Court of the State of Georgia, for the murder, on December 6, 1942, of his paramour, Sarah Frances Thompson. The defendant and the deceased were both negroes,—which is mentioned only because of the allegations of Johnson in the instant case. Immediately after the killing Johnson fled to Alabama, but waived extradition, was taken back for trial, and the jury[1] found him guilty of murder with a recommendation of mercy[2] on January 25, 1943.

In June, 1943, in a prison-break by 175[3] prisoners,

---

[1] That he was convicted by verdict of the jury appears from the certified record offered by Johnson in the instant habeas corpus proceeding. However, Johnson contended that he pleaded guilty after the jury had returned to render its verdict; and alleged that his counsel said that he would "get the chair" unless he pleaded, and that he did so through fear.

[2] Under Georgia law this recommendation fixes the penalty at life imprisonment. If no recommendation of mercy is made, the penalty is death by electrocution.

[3] Johnson's affidavit to the petition for habeas corpus.

Johnson escaped, and eventually came to Allegheny County, Pennsylvania, where he was apprehended. Governor Arnell of Georgia issued a requisition to the Governor of Pennsylvania, who issued an executive warrant under which Johnson was arrested. Johnson made no request for a hearing before the Governor, but later sued out a writ of habeas corpus against Dye, warden of the Allegheny County jail, on which the court of common pleas of Allegheny County entered into a full hearing, received *all* evidence offered by the relator, and dismissed the writ. The relator appealed.

The positions of the relator apparently are (1) that he was improperly convicted (that a demurrer to the evidence would have been good and that the corpus delicti was not proved); (2) that witness or witnesses for the State of Georgia testified falsely because of intimidation and force practiced by police officers upon them; (3) that while undergoing his sentence he received brutal treatment from the prison guards, who threatened to kill him, and that his life will be endangered if he is returned to Georgia.

Appellant claims that the court below refused to review the propriety of his conviction. It may well be doubted that an escaped convict may substitute a writ of habeas corpus for a writ of error or appeal unless the original trial was absolutely void: *Moore v. Dempsey,* 261 U.S. 92. In an exhaustive opinion by President Judge KELLER in *Commonwealth ex rel. Mattox v. Superintendent of County Prison,* 152 Pa. Superior Ct. 167, 31 A. 2d 576, it was held that the court of common pleas, upon a habeas corpus, could not enter into the question of the guilt or innocence of the fugitive who escaped *before* trial. Without reviewing the limits of the court's power to examine the trial and conviction of the relator, it is apparent that there was no prejudicial error in the instant case in that respect, because the record of the relator's conviction in Georgia is unimpeachable, and no demurrer to the evidence could be

sustained. The evidence established that Leon Johnson, about thirty-one years of age, rented a room in the city of Marietta from James Jones, a colored man, and lived therein with Sarah Frances Thompson, the deceased, who was about twenty-two years old. To some people he alleged that they were married. The defendant was having difficulty with the deceased because he had determined to leave her and go to California.[4] She wanted him to marry her and tried to enlist the help of the chief of police. Her father also urged the defendant to marry her, but he refused so to do. Very shortly before her death defendant beat the deceased with a broomstick and her outcries were heard by various witnesses. There was other evidence of his ill will toward her. The sound of a shot was heard and when Johnson's room was entered the *unclothed*[5] body of the deceased was found on a bed. Her dress and sweater were "stuck in the mattress."[6] She died instantly from a gunshot wound in the head.[7] Immediately after the killing Johnson was seen with a shotgun and a broomstick. The latter, broken in two pieces, was offered in evidence. It was bloodstained and had pieces of hair on it.[8] On the same day Johnson sold a shotgun with two twelve-gauge shells to Joe Ferguson, who so testified. The shotgun so sold by Johnson belonged to Bub McConnell and had disappeared from the latter's room on the day of the killing. Johnson was familiar with the place where the gun was kept. The crime was reported to police officers by the colored people themselves, one of whom[9] heard Johnson, shortly before the killing, threaten to "kill him

---

[4] In his habeas corpus affidavit Johnson said the girl told him he was "running out" on her.

[5] Evidence of the landlord, James Jones; evidence of Blackwell, the undertaker.

[6] Evidence of Elmer Manning, decedent's father.

[7] This disposes of the question of corpus delicti.

[8] Evidence of Elmer Manning.

[9] Price Jordan.

a negro", and volunteered that statement to the police. It is apparent that no racial conflicts were involved and that the colored people of the vicinity desired the girl's killer to be brought to justice.

In the State of Georgia on an indictment for murder the defendant may not testify, but is permitted to enter his defense by means of a written statement made by him at his convenience, in which he presents (presumably with the aid of his lawyer) the facts upon which he relies. This statement is read to the jury. This method is a distinct advantage to a defendant in that his story may not be tested by cross examination, nor his narrative given in a confused or halting fashion.[10] The defendant made such a statement in the murder trial, in which he was represented by a lawyer of standing, chosen and paid by the defendant. His defense was that the deceased threatened to kill him with a shotgun which he grabbed, and in the struggle it was accidentally discharged, killing her instantly. The defendant stated he did not know the gun was loaded.

The charge of the court was fair and impartial, and emphasized the defendant's presumption of innocence and the requirement of proof beyond a reasonable doubt. It specifically called to the jury's attention the question of a recommendation of mercy, stating that if made it

---

[10] In England, in 1898, the Criminal Evidence Act came into being, so that a defendant in a murder trial was given the right to testify. It was recognized and publicly stated by Sir Marshall Hall (the foremost criminal lawyer of England), and by Sir Edward Carson (the foremost advocate of England), that the prisoner was usually put to a distinct disadvantage by the new act. If he testified, quite often he was demolished by cross examination (Sneddon was thus convicted) ; if he failed to testify the jury was against him. Indeed, Marshall Hall, when defending on a charge of murder, gave a defendant two slips of paper, one stating, "I wish to give evidence in this case"; the other, "I do not wish to give evidence in this case." He required the defendant to sign his decision. He pursued this course because he made it a rule never to take on himself such a responsibility, as he recognized the great danger to the defendant in either course.

meant a sentence of life imprisonment. A careful examination of the record of the murder trial discloses that the defendant was by no means unfortunate in the verdict and sentence attained.

The contention that the police officers secured false testimony by intimidation and force rests solely on the relator's own testimony. The claim that the relator was brutally treated while undergoing his sentence rests on the relator's unsupported word. The relator's testimony that the prison guards threatened to kill him and will kill him if he is returned is without any corroboration. The chief of police of Cobb County, Georgia, testified that within his more than three years' experience the prisoners were not ill-treated, that no prisoner had died of violence or neglect, and that the Georgia "Chain Gang" was abolished three years ago.

It is manifest that little or no reliance could be placed upon the relator's evidence in the court below, and that record affirmatively shows him to be an untrustworthy witness. In the written statement of the defendant in the murder trial he averred that the decedent was waiting for him when he entered the house, stating: "I went on down to the house and when I walked in there there she [Sarah Frances Thompson, the deceased] sat with the gun in her hand and I walked in the door and *I reached and grabbed the shotgun, the stock part of it, and grabbed the barrel* and we tusseled over the gun . . . and the gun went off." (Emphasis supplied). In his long affidavit attached to the petition for habeas corpus (and also offered in evidence by him) the relator averred that he was in the house first, and that the decedent burst through the door with a shotgun; the relator stating: "I *arrived* at my room about 3:00 A.M. and was undressing . . . [and] was pulling on my pajamas and playing with my little puppy dog when Sarah burst in the room . . . pretty well intoxicated . . . *She stepped in the door*—all alone—and asked me in a violent manner, [what he had to say to save himself] . . . I tried to talk nice and sweet to her

to persuade her to think what she was doing . . . but she was too mad and drunk to hear what I said—I was standing in the doorway of a clothes closet pulling on these pajamas—and I said if she was aimin' to kill me— please let me die with my puppy in my arms, for I dearly loved this little dog. I picked up the dog a 3 mo. old 15 lb. water spaniel, and I threw the dog toward her so it hit her in the chest and knocked her slightly off balance . . . I then proceeded to fight for my life as I tried to take the shotgun away from her and got her turned around so she fell back on the bed. We both had a hold of the gun. *I don't remember how I had held it or which end of it was in my hands* but the gun was discharged the blast hitting Sarah in the side of the head . . ." (Emphasis supplied). The long affidavit to the petition does not explain how it came that the body of the deceased was found *unclothed* very shortly after the killing, the clothing being stuck in the mattress. Many other inconsistencies and contradictions exist between his statement read to the jury in the murder trial, his long affidavit called the "story of his life" in the habeas corpus, and his testimony in the habeas corpus.

The appellant complains that the court below would not determine the facts as to the alleged brutal treatment of the prison guards and the danger to relator's life if returned; but that was not the court's position. The court stated, in a brief opinion dictated at the close of the evidence: ". . . there is no warrant for a writ of Habeas Corpus . . ." That, of course, only meant that the defendant did not convince the court that he should be discharged.

In the instant case the burden was on the relator to convince the court below of the truth of his averments. That court was not convinced and dismissed the writ, and the question before us is whether there was an abuse of discretion by it resulting from a disregard of substantial evidence: *Commonwealth ex rel. Mattox v. Superintendent of County Prison,* 152 Pa. Superior Ct. 167,

31 A. 2d 576. There was no abuse of that discretion. We have painstakingly examined the record in the murder trial and in the habeas corpus, irrespective of the fact that the court below refused to find for the relator, and it is difficult to see how any court could have arrived at any other conclusion.

Judgment affirmed.