Commonwealth ex rel. Brown, Appellant, *v.* Baldi.

Argued January 12, 1954. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

*David Levinson,* for appellant.

*Samuel Dash,* Assistant District Attorney, with him *Michael von Moschzisker,* First Assistant District Attorney and *Richardson Dilworth,* District Attorney, for appellee.

*James W. Tracey, Jr.,* Assistant Deputy Attorney General, for State of Georgia.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 4, 1954:

This is an appeal from an order of the court below dismissing a petition for a writ of habeas corpus and ordering the relator to be delivered to the custody of agents of the State of Georgia for return to that State.

The relator, Edward Brown, was arrested in Philadelphia on March 31, 1952, by agents of the Federal Bureau of Investigation on a charge of illegal flight from imprisonment in Georgia. He was turned over to the Philadelphia police and committed to prison by a magistrate to await extradition papers from that State. On April 23, 1952, the Governor of Pennsylvania issued a warrant for his rendition to Georgia. A few days thereafter he petitioned the court below for a writ of habeas corpus alleging that he had been subjected during his imprisonment in Georgia to cruel and unusual punishment in violation of his constitutional rights, and, if returned there, would again be subjected to such punishment. A motion to intervene on the part of Georgia was granted by the court but its further motion to dismiss the proceedings was denied.

A number of hearings were held on the relator's petition at which it appeared that he had pleaded guilty in Georgia in 1937 to a charge of murder and was sentenced to life imprisonment. A few months later he escaped to Cincinnati. Recaptured in June,

1940, he escaped again in September of that same year, going first to Cincinnati, then to Detroit, and finally to San Francisco. Recaptured in August, 1947, he escaped the third time in January, 1950, to Lakeland, Florida, and afterwards to Philadelphia where he was arrested two years later as above stated. He gave a harrowing description of horrible tortures which he claimed were inflicted upon him during the course of his imprisonment. Counsel for the State of Georgia moved the court for permission to take depositions of witnesses there for the purpose of refuting relator's testimony; for some reason such permission was refused but later the Assistant Director of the Board of Corrections of the State of Georgia appeared in person as a witness and denied many of relator's allegations. The court, however, stated that it was satisfied that relator, during the period of his confinement in work camps in Georgia, had been subjected to cruel and unusual punishment and, if returned to the custody of Georgia, was likely again to be subjected to such punishment. This latter foreboding would seem open to grave question in view of the fact that there was placed in evidence (1) an amended Constitution adopted by Georgia in 1945 which banned whipping as a punishment for crime and prohibited cruel and unusual punishments and the abuse of any person while under arrest or imprisonment; (2) Acts adopted in Georgia in 1943 and 1946 creating a State Board of Corrections and forbidding all forms of corporal punishment and the use of shackles, manacles, picks, leg-irons and chains by any correctional institution, public work camp, highway camp, or other institution of confinement; (3) rules and regulations governing the penal system adopted by the State Board of Corrections in 1946 which prohibited the use of corporal punishment or the manacling of prisoners,

and, in general, provided for a humane administration of the prisons and work camps in the State; and (4) testimony of the Assistant Director of the State Board of Corrections to the effect that the entire prison system in Georgia had been remodeled, and giving assurance that if the relator were returned he would not be subjected to any cruel or unusual punishment whatever.

Notwithstanding its findings as to past facts and future probabilities the court below properly concluded that it was bound by the decisions of the Supreme Court of the United States and of this State to dismiss relator's petition, which it accordingly did.

Article IV, sec. 2, cl. 2, of the Federal Constitution provides that "A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up to be removed to the State having Jurisdiction of the Crime." This provision is implemented by the Act of Congress of June 25, 1948, c. 645, 62 Stat. 822, 18 USCA § 3182. At least as early as the case of *Marbles v. Creecy, Chief of Police,* 215 U. S. 63, decided in 1909, it was declared that the executive authority of a State in which an alleged fugitive might be found, and for whose arrest a demand was made in conformity with the Constitution and laws of the United States, need not be controlled in the discharge of his duty by a suggestion that the fugitive would not be fairly and justly dealt with in the State to which it was sought to remove him nor be adequately protected, while in the custody of such State, against the action of lawless men. The court said that "The court that heard the application for discharge on writ of habeas corpus was entitled to assume . . . that the state demanding the arrest

and delivery of the accused had no other object in view than to enforce its laws, and that it would, by its constituted tribunals, officers, and representatives, see to it not only that . . . he . . . would be adequately protected while in the state's custody against the illegal action of those who might interfere to prevent the regular and orderly administration of justice."

The latest decision of the United States Supreme Court, and one that clearly controls the present case, was rendered in the case of *Sweeney, Sheriff, v. Woodall,* 344 U. S. 86. There a fugitive from an Alabama prison was arrested in Ohio and held for return to Alabama pursuant to proceedings instituted by the Governor of that State. He claimed in Ohio that his confinement in Alabama amounted, and would again amount, to cruel and unusual punishment contrary to the Eighth and Fourteenth Amendments, and he applied unsuccessfully to the Ohio courts for release on a writ of habeas corpus. He then applied to the United States District Court for the Northern District of Ohio for habeas corpus on the same grounds. The District Court dismissed his petition but the Court of Appeals for the Sixth Circuit reversed. The Supreme Court granted certiorari and, in turn, reversed the judgment of the Court of Appeals. In a Per Curiam opinion the Court said: "The scheme of interstate rendition, as set forth in both the Constitution and the statutes which Congress has enacted to implement the Constitution, contemplates the prompt return of a fugitive from justice as soon as the state from which he fled demands him; . . . . Considerations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by Alabama in the courts of that State. Respondent should be required to initiate his suit in the courts of Alabama, where all parties may be heard,

where all pertinent testimony will be readily available and where suitable relief, if any is necessary, may be fashioned." Relator, in the present case, tries to distinguish that decision on such grounds as that the appeal to the Supreme Court there was from proceedings in a Federal, not a State court; that the present proceedings were under the Uniform Criminal Extradition Act, not under the Federal legislation; and that the State of Georgia, unlike the State of Alabama in the *Sweeney* case, appeared in the present proceedings. These, however, are all distinctions which obviously do not affect the fundamental principles involved. No proceedings in a State court, statutory or otherwise, can conflict with, much less override, the Constitution and the laws of Congress thereunder, which are the supreme law of the land.

Even before the *Sweeney v. Woodall* case similar decisions had been rendered by United States Courts of Appeals in the District of Columbia (*Johnson v. Matthews*, 182 F. 2d 677), in the Eighth Circuit (*Davis v. O'Connell*, 185 F. 2d 513), and in the Ninth Circuit (*Ross, Sheriff, v. Middlebrooks*, 188 F. 2d 308). In each of those cases the relator alleged that he had been subjected to cruel punishment while imprisoned in the demanding State and would be again subjected to such punishment if returned there, but it was uniformly held that if the fugitive's constitutional rights were violated in the State where he had been imprisoned it was in that State that he must protect those rights, either in the courts of the State itself or, if it became necessary to appeal thereto (28 USCA §2254), in the Federal courts as well.

Our own court, following the decision in the *Sweeney v. Woodall* case, has thrice dealt with this same problem. In *Commonwealth ex rel. Henderson v. Baldi*, 372 Pa. 463, 93 A. 2d 458, it was held, in proceedings

for extradition under the Uniform Criminal Extradition Act of July 8, 1941, P. L. 288, that no consideration could be given to the fugitive's allegation that if he were returned to the demanding State he would be subjected to cruel and unusual punishment. In *Commonwealth ex rel. Hatton v. Dye,* 373 Pa. 502, 96 A. 2d 127, the same ruling was made, and it was stated that "The obvious intendment of the Uniform Criminal Extradition Act and the recent statements of this Court and the Supreme Court of the United States was to restrict the scope of a hearing on habeas corpus to the legality of the arrest of the fugitive in the asylum state and the propriety of the requisition procedure." And in *Commonwealth ex rel. Huey v. Dye,* 373 Pa. 508, 96 A. 2d 129, it was once more held that in a habeas corpus proceeding by a fugitive who was resisting extradition no consideration could be given to his allegation that if returned to the demanding State his life would be in danger.

Relator, taking note of a sentence in the court's opinion in *Sweeney v. Woodall* that "Respondent makes no showing that relief is unavailable to him in the courts of Alabama," offered evidence designed to show that he would not have access to the courts of Georgia if returned to that State. There was testimony that some years in the past letters to higher prison authorities and to lawyers written by relator and other prisoners had been intercepted by wardens and guards and prevented from reaching the persons intended. It was claimed also that relator would find it difficult to obtain counsel in Georgia who would be willing to represent him and witnesses who would not be afraid to support him in his allegations of brutal treatment. But the testimony thus presented and the apprehensions thus expressed cannot be accepted, and were not accepted by the court below, as proof that if relator were

now returned to Georgia he would be prevented from recourse to the courts of that State or to the Federal courts for the protection of his constitutional rights.

In his concurring opinion in the *Sweeney v. Woodall* case, Mr. Justice Frankfurter said: "We cannot assume unlawful action of the prison officials which would prevent the petitioner from invoking the aid of the local courts nor readily open the door to such a claim . . . Our federal system presupposes confidence that a demanding State will not exploit the action of an asylum State by indulging in outlawed conduct to a returned fugitive from justice."

The suggestion that if the relator were returned to Georgia he would be deprived of legal help and protection must be rejected. Apart from relator's own competent counsel, the Assistant Attorney General of the State of Georgia and the able Philadelphia counsel appointed by the State of Georgia as a Deputy Assistant Attorney General, both of whom appeared in the present proceedings on behalf of that State, can, with confidence, be relied upon to see to it that relator will be afforded every reasonable opportunity to communicate with counsel and have all necessary access to the courts for the protection of any constitutional or other legal rights to which he may be entitled.

Order affirmed.

---

CONCURRING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I concur in the opinion of the Court. Our decision in *Commonwealth ex rel. Henderson v. Baldi*, 372 Pa. 463, 93 A. 2d 458 (1953), which the majority opinion cites with approval, was the unanimous opinion of the five members of the Court who heard argument of the appeal (Chief Justice DREW having resigned and

Justice MUSMANNO being absent). The decision in the *Henderson* case is in conformity with the opinion of the Supreme Court of the United States in *Sweeney v. Woodall*, 344 U. S. 86 (1952). Three months after our decision in the *Henderson* case, we unanimously reversed a lower court's grant of a writ of *habeas corpus* to a fugitive from imprisonment by another state who alleged that, if returned to the demanding state, *his life would be in danger*: see *Commonwealth ex rel. Hatton v. Dye*, 373 Pa. 502, 96 A. 2d 127. The opinion in the *Hatton* case to which six members of this Court, as presently constituted, subscribed without dissent (Justice BELL alone being absent), cited and quoted with approval from the *Henderson* case. And, on the same day, in *Commonwealth ex rel. Huey v. Dye*, 373 Pa. 508, 96 A. 2d 129, we affirmed the refusal of a writ of *habeas corpus* to a fugitive whose similar allegation was that, if returned to the demanding state, *his life would be in danger*. The decision in the *Huey* case was likewise on the unanimous opinion of the same six members of the Court who agreed that "As to relator's contention that his life will be in danger if he is returned to the demanding state, a similar contention was considered and rejected by this Court in the case of Commonwealth ex rel. Hatton v. Dye, [supra]."

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The clanking of chains on a person's body is an ominous and incongruous sound in a country that was born amid the music of a Liberty Bell.

It was because of the brutality visited upon mankind down through the centuries by monarchs and their hirelings that the patriot fathers of this Republic interdicted in the Constitution of the United States all forms of cruel and unusual punishment. This same in-

junction was made part of the Constitution of Pennsylvania. It is, therefore, a strange and anomalous thing to find that the highest tribunal in this Commonwealth, where liberty in America drew its first breath of life, should order a citizen of the United States out of the confines of Pennsylvania and back to an incredulous realm where chains and the other trappings of tyrannical punishment must surely await him.

On April 23, 1952, the Governor of Pennsylvania, on demand of the Governor of Georgia, issued a warrant of extradition for the return to Georgia of Edward Brown who had fled from imprisonment in that State. The prisoner applied to the Court of Common Pleas of Philadelphia for a writ of habeas corpus, and, at the hearing which followed in the courtroom of Judge Levinthal, there unfolded such a tale of torture, cruelty and sadistic punishment that one could believe this was a story of happenings in a Nazi concentration camp and not the recital of events in one of the sovereign States of America.

Edward Brown testified that during his imprisonment he was shackled with chains between both feet, that his right foot had to drag a 20 foot chain with a 15 pound ball and that his left ankle was encased in a pick. Asked to describe this latter device, he said that a blacksmith removes the handle from a pick, cuts "the eye out of the pick" and then rivets the metal to the prisoner's leg. "Q. Did the pick that you had on have points to it or were the points sawed off the way that shows? [Referring to a photograph]. A. It had sharp points. Q. How long would you say these prongs extended before and after your leg? A. About a foot on each end of my leg this way (indicating), and it was made in the form that if I walked, it would stick in the ground; if I would run, it would stick me back here (indicating)."

The shackles and pick worn by the prisoner cut flesh and bone, leaving scars which were exhibited to the judge in the court below. Brown also exposed other scars resulting from beatings administered by walking sticks, staves, rubber hose and blackjack. On one occasion, while carrying, with another prisoner, a stringer weighing from 175 to 200 pounds, all the time being shackled with ball, chain and pick, Brown fell and suffered a broken leg and arm. He languished for two days with his fractured bones before medical treatment was offered.

Brown described food that could not be eaten and unsanitary conditions that cannot be described, he told of being driven to work in swamps infested with poisonous snakes. There are over 150 pages of this harrowing testimony in the record, evidence produced not only by the relator but by seven other former inmates of Georgia's "work camps." Listed among the many crude and refined tortures to which prisoners were subjected were the "staking treatment," the "sweat box", the "dipping barrel," and the "Georgia rack."

Asked to tell about the "staking treatment," the prisoner testified: "A. They stake you out and stretch you just as wide as they can stretch you and they nail a stake to this hand, a stake to there, a stake to your feet, and a stake to here, putting a chain across your chest and stake you to that (indicating.) Q. When they got through staking you out they did what? A. They poured black molasses all over your face and all over your body. You are stripped down to your body. They pour black molasses syrup all over you and flies and insects and bees and everything else bite you and stick you and do everything else to you. Also they turn loose the dogs."

After this grim tale, Brown's counsel called the Court's attention to one of the scars resulting from dog bites: "Two inches horizontally, and about an inch vertically under the left eye."

The "sweat box" treatment locked the prisoner into a heavy wooden structure about five feet high and some three feet square, thus not high enough to permit standing or deep enough to permit sitting. A small hole "two inches in circumference" allowed for the only ventilation. Prisoners were sealed into this medieval contraption for days at a time while a hot Georgia sun battering at a thin roof produced a temperature of 120 degrees.

The "dipping barrel" routine chained the prisoner in a wooden hogshead in a kneeling position, his head about two feet below the top of the barrel. When the water, running in through a hose, reached the prisoner's chin he was given two tin cups with which to furiously bail or suffer "accidental drowning".

The so-called "Georgia rack" was an apparatus which "stretched" the prisoner. With feet attached to an immovable hook and hands tied to a cable, a turning crank on a windlass pulled the body to its utmost tension point and then released it—over and over. Asked what were the results of this treatment, Brown replied: "It almost pulled you to pieces. I have a knot in my back from the results of that now."

After relating the "stretching" operation, Brown told of being "hung up to a tree by the wrists with chains": "They hung me up just as high as I could reach. My toes were barely touching the ground, and they left me there and they beat me while I was hanging there."

He was placed in stocks and beaten; a Captain Dyke rubbed his feet with a corncob and then com-

pelled him to bathe his feet in liniment. Describing one occasion when the pain of torture was more than he could bear, he testified: "I started calling on the Lord, and he asked me what I was saying, and I said, 'Nothing but just calling on the Lord,' and he said, 'I'm your God.' "

The testimony revealed other blasphemous and inhuman treatment horrible to appraise and revolting to contemplate. It may be, as the majority of this Court believes, that the processes of law cannot open the door at which the relator pleads for relief, but the world must know to what the law dooms the prisoner so that in some manner, through legislative or judicial interposition, other victims may be spared the living hell to which Edward Brown is being returned. I believe, however, that the law has supplied this Court with numerous keys to open the door of sanctuary and save Edward Brown from the fate which inevitably and unjustly awaits him.

Judge LEVINTHAL in the court below was convinced of the authenticity of the evidence presented before him and stated in his Opinion that "relator, while confined in the Work Camps at Cochran and at Blackshear, Georgia, was subjected to cruel and unusual punishment". He further stated that "when returned to the custody of Georgia he (Brown) is likely again to be subjected to such punishment."

Although obviously impressed with the relator's case for discharge on a writ of habeas corpus, the court below believed that it had no power to grant relief because of the decision by the Supreme Court of the United States in the case of *Sweeney v. Woodall*, 344 U.S. 86. That case, however, is very clearly distinguishable from the one at bar. The *Woodall* case went up to the Supreme Court of the United States from a Federal District Court, whereas this is an appeal from

a Pennsylvania State court. Furthermore, in the *Woodall* case, the Supreme Court stated, "the demanding state is not a party before the federal court." Here, on the contrary, the State of Georgia appeared, participated in the litigation, and actively contested the issuance of the writ of habeas corpus. And then, most important of all, and to me conclusive, is the fact that the United States Supreme Court in the *Woodall* case pointed out that the prisoner "makes no showing that relief is unavailable to him in the courts of Alabama." Here, to the absolute contrary, as will be demonstrated later, the prisoner made a considerable showing that relief would be unavailable to him in Georgia.

Although the crime which was originally committed in Georgia by Brown has no bearing on the question involved in this proceeding, I believe it is only fair to submit the petitioner's view of what occurred, in view of the statement in the Majority Opinion that the defendant pleaded guilty in 1937 to a charge of murder. Paragraphs 7 and 8 of the petition for the writ of habeas corpus abbreviatedly assert the following: On April 24, 1937, at Macon, Georgia, Brown seriously injured one of his fingers. He hailed a cab to take him to a hospital. A woman, also colored, and under the influence of liquor, insisted that she wanted the cab. Her husband, the deceased, Julius Kemp, (and whom Edward Brown had previously never known,) drew a switch-blade knife and attempted to cut Brown.

As Brown pushed Kemp away from him, Kemp was cut in the neck by his own knife while it was still in his own hand. The cutting was accidental and unintentional and, on Brown's part, clearly in self-defense.

The cab driver then took both men to the hospital, but at the hospital they were ignored for 2 hours. In this time Kemp continued to bleed and eventually died from loss of blood. Brown was charged with murder

and he pleaded not guilty. A lawyer obtained between $150 and $200 from Brown's family to defend him. He complained that this was not enough and advised Brown to change his plea from not guilty to guilty. He assured him: "I'll get you off with a light sentence." Brown followed his lawyer's advice and was sentenced to life imprisonment on the chain-gang.

It may be in order to add also that following his escape from Georgia on two different occasions Brown conducted himself as a law-abiding citizen. Evidence introduced in the lower court at the habeas corpus proceedings established that during the escape periods he was steadily and gainfully employed. Employers testified to his industry, sobriety and loyalty. Employers outside of Philadelphia submitted letters of recommendation as to Brown's good work and his good reputation for being law-abiding.

On July 8, 1941, the State of Pennsylvania adopted the Uniform Criminal Extradition Act (P. L. 288), and on February 21, 1951, Georgia did likewise. The State of Georgia, thus having elected to proceed under the Pennsylvania Uniform Criminal Extradition Act of 1941 rather than by Federal extradition, is bound by the pertinent laws of Pennsylvania which include our various enactments on habeas corpus jurisdiction and procedure.

The scope of inquiry in Pennsylvania habeas corpus proceedings is much more extensive than that allowed by Federal procedure. Section 1, of the Pennsylvania Habeas Corpus Act of July 1, 1937, P. L. 2664; 12 PS, sec. 1892, provides: "In *all* cases where writs of habeas corpus are granted, the judge granting the writ may inquire and examine into the facts of the case." *

* Italics throughout, mine.

Obviously extradition proceedings are encompassed in the word "all."

The Majority Opinion, in limiting the inquiry in extradition habeas corpus proceedings, would seek to force it into the strait jacket of the Act of May 24, 1878, P. L. 137, as amended by the Act of June 4, 1879, P. L. 95, which did say that the—". . . investigation and hearing under said writ shall be limited to the question of identification, and shall not enter into the merits or facts of the charge, or indictment."

However, that strait jacket was ripped apart by the Act of 1937, which specifically states in Section 2: "Such examination into the facts of the case shall include an examination by the judge *into all the proceedings held and evidence produced* before a judge, magistrate, justice of the peace, or other officer sitting as a committing judge or magistrate, and if such proceedings shall, after inquiry, be deemed to have been conducted not in accordance with law, or the evidence deemed insufficient, the prisoner shall be discharged."

If the Legislature had not intended, in the Act of 1937, to broaden the field of the inquest, the passage of the legislation indicated would have been a mere parliamentary vocal exercise. However, the solemn seriousness of that Act can be noted in the quoted section which enlarges the examination by the judge into *"all the proceedings held and evidence produced."*

Section 10 of the Uniform Criminal Extradition Act of 1941, makes it mandatory upon State authorities to inform fugitives of their right to apply for a writ of habeas corpus, and it does not in the reference to habeas corpus proceedings, change, modify or limit in any way the language of the Pennsylvania Habeas Corpus Act of 1937.

The law may move on leaden feet, but once planted on the solid rock of established justice, it cannot be

dislodged by the zephyrs of dogma or the protestations of obiter dictum. Nothing can, therefore, be clearer than the proposition that in the present state of our jurisprudence, when a fugitive from another State comes into the Pennsylvania courts and pleads sanctuary, our courts are required to determine, under *all the facts,* whether that sanctuary should not be assured.

The question involved in this case came squarely before the Pennsylvania Superior Court in the case of *Comm. ex. rel. Mattox v. Supt. of County Prison,* 152 Pa. Superior Ct. 167. On July 11, 1942, Mattox was arrested by virtue of a warrant issued by the Governor of Pennsylvania pursuant to a request for his extradition by the State of Georgia to answer a charge of assault with intent to kill. At the ensuing hearing, on the petition for a writ of habeas corpus sought by Mattox, it developed that the state of feeling against Mattox in Elbert County, Georgia, (locale of the alleged crime) was such that a fair and impartial trial would be impossible, and that Mattox faced grave danger of being lynched. The lower court granted the writ and discharged the relator. The Pennsylvania Superior Court affirmed the action. In a brave and brilliant opinion written by the distinguished President Judge KELLER, it was pointed out that Section 10 of the Uniform Criminal Extradition Act of July 8, 1941, supra, specifically provides that "the prisoner, whose extradition is sought, shall have the right to apply for a writ of habeas corpus," and that under the Habeas Corpus Act of July 1, 1937, P. L. 2664, "the judge granting the writ of habeas corpus 'may inquire into the facts of the case.' " This means that the judge may "inquire into the facts averred as ground for the relator's claim that he should not be delivered over to the representatives of the demanding State." Pres-

ident Judge KELLER wrote: ". . . the decisions of the Supreme Court of this Commonwealth and of the Supreme Court of the United States, by necessary implication, hold that where there is sufficient competent evidence to sustain a charge that the accused relator will be unable to have a fair trial and will be in grave danger of being lynched if returned to the demanding State for trial, the judge hearing the writ of habeas corpus may refuse to give him over into the custody of its representatives."

Judge KELLER in his Opinion recalled the decision of the Supreme Court of the United States in *Pierce v. Alabama*, 306 U. S. 354, where the Court said: "When a claim is properly asserted—as in this case—that a citizen whose life is at stake has been denied the equal protection of his country's laws on account of his race, it becomes our solemn duty to make independent inquiry and determination of the disputed facts."

Judge KELLER also cited *Marbles v. Creecy*, 215 U. S. 63, where the Supreme Court affirmed an order refusing a writ, stating that the writ could not issue on a "mere suggestion—certainly not one unsupported by proof" Commenting on this, Judge Keller said that this language implied that: ". . . *if the charge or averment on behalf of the relator* was not a 'mere suggestion, unsupported by proof,' as in that case, but *had been established to the satisfaction of the judge, who granted the writ of habeas corpus, and who pursuant to law, had inquired into the facts alleged, it would have been a sufficient ground for releasing the relator from custody and refusing to deliver him up to the representatives of the demanding State."*

This same line of reasoning appears in the *Woodall* case which the Majority here, in my opinion, incorrectly sets up as a barrier across the highway of release for Edward Brown. The Supreme Court pointed out

in the *Woodall* case that the "respondent makes no showing that relief is unavailable to him in the courts of Alabama." I believe that it is logical and legitimate to infer from this statement that if the respondent had made such a showing, the decision of the Supreme Court of the United States could well have been otherwise. That inference gains strength from the Concurring Opinion of Mr. Justice FRANKFURTER who said: ". . . It is appropriate to emphasize that in this case there is no suggestion in the application for the writ of habeas corpus that the prisoner would be without opportunity to resort to the courts of Alabama for protection of his constitutional rights upon his return to Alabama. We cannot *assume* unlawful action of the prison officials which would prevent the petitioner from invoking the aid of the local courts nor readily open the door to such a claim."

In the instant case, it is not a question of *assumption*. The record is replete with evidence that Edward Brown would be without opportunity to resort to the courts of Georgia for the protection of his constitutional rights. The Majority makes the mistake of pitting *assumption* against proved facts. Who does not remember the tragic case of *Frank v. Mangum*, 237 U. S. 309, where the prisoner was refused the writ of habeas corpus because it was *assumed* that he would have all the protection dictated by law in the State of Georgia? In spite of this assumption, a mob broke into the prison in which Frank was being held, overpowered the guards, seized Frank, carried him through the night a distance of 125 miles and then hanged him to a tree.*

The Majority Opinion confidently asserts that upon Brown's return to Georgia he will have no difficulty

---

*10 American State Trials, pp. 412, 413, cited in *Com. ex rel. Mattox*, supra.

in obtaining legal counsel to take his case into the courts of Georgia. But it is not from the record in these proceedings that such confidence can be drawn. Brown's present counsel David Levinson and Theodore O. Spaulding, who have received no compensation for their long, arduous battle in behalf of their client, cannot be with him in Georgia. How is Brown to obtain a lawyer to defend him? He is not a resourceful nor a learned person. He is a penniless, uneducated Negro who, since 1937, (with the exception of the periods he was free because of escape from Georgia), has been hammered on the anvil of torture until all natural self-reliance and self-resiliency must be reduced to a very thin layer in his consciousness. But even if he were well-educated and physically robustious, how is he to initiate legal proceedings in a remote, out-of-the-way rural prison camp separated from a courthouse by miles of geography, swamps of prejudice and mountains of official opposition?

Brown testified: "Q. Mr. Brown, while you were at Blackshear did you ever attempt to communicate with a lawyer or with friends, asking them to get a lawyer for you in order to try to relieve your condition there of punishment? A. Yes, sir, I did. Q. How often? A. Every time I could get a chance to write a letter. You are only allowed to write one letter a week, and whenever you write a letter concerning something like that the warden stops in and tear it up and beats you all up, and you are scared to even do anything else about writing . . . Q. What happened to that letter? A. It was torn up in front of my face and I got knocked in the head with a piece of iron bolt. Q. Who tore it up? A. Mr. Ammon. Q. Who was he? A. That was the warden. Q. Who beat you? A. Mr. Ammon and his guards, Mr. Roundtree and Mr. Teuton. They held the gun on me and he done the beating."

Nathan Jones, a former Georgia "work camps" prisoner, testified: "Q. Do you know whether Mr. Brown at any time while he was in Blackshear sent any letters out? A. I do know he sent two, Mr. Levinson. He sent the first one; he sent it for a transfer back. Q. What happened to that letter, if you know. A. The warden tore it up. Q. You know that? A. I know that he tore it up . . . He tore it up and said he run that chain gang and he said he wanted him to understand—he punched him; he punched him with his left hand. There was iron bolts there. He throwed up his hands to try to dodge. Q. Brown threw his hands up to try to dodge? A. Yes. Q. What happened? A. The guard threw the shotgun on him, and he hit him on the head with an iron pin from a bulldozer that sticks in the corner, an iron pin that long. Q. Show how thick it was. A. That big around (indicating). THE COURT: About an inch and a half and about a foot long."

Nathan Jones also testified that he never saw any lawyers come into the prison camp to visit prisoners.

Another prisoner, Huel Thompson (white) testified: "Q. How about a letter to a lawyer, did any get through that you know of? A. I tried three. The first two I didn't say nothing about. They tore the last one up in my face and didn't even give me a visit for seven months. Q. Were you punished? A. My visiting and writing was taken away from me for seven months."

And then even if a lawyer could be found who would take the case without remuneration and he could file a petition for a writ of habeas corpus, how would he obtain witnesses when it is obvious that prisoners cannot proceed of their own will to court to testify, and, it is not likely, in view of the evidence which we have seen, that a venal warden would willingly allow them to go to court. And if subpoenaed, would the witnesses,

knowing what would be awaiting them back at the prison camp, testify adversely to the warden and guards?

It is a facile thing to say that one has the right to assert oneself in court, but of what avail is that right without the medium for its expression? An academic right without the possibility of fulfillment is of no more substance than a scabbard without a sword, a library without a book, or a robe without a judge.

No one questions or could reasonably question that, if the facts proved beyond the peradventure of doubt that upon return to the demanding state the prisoner would be lynched, the asylum state would not refuse relief, any more than it could refuse relief if it could be established that the prisoner was to be executed without a trial. The thongs of technical procedure do not bind our hands to the point that we are helpless to prevent outright murder. With the type and quantity of evidence in this record which practically guarantees cruel and unusual punishment to the relator, how can we send him back on the unsubstantial theory that the courts of Georgia are open to hear his cause? Brown must first get to the courts before they can hear him.

In the *Mattox* case already cited, the Solicitor General of the Northern Judicial Circuit of Georgia, demanding the return of Mattox to Georgia, objected to the judge presiding over the habeas corpus proceedings on the ground that when that judge (the Honorable and late lamented FENERTY) was a member of Congress he had sponsored anti-lynch legislation. This, the Georgia Solicitor General maintained, disqualified Judge FENERTY from sitting on the case! In refusing the writ, Judge FENERTY wrote a brilliant page in the defense of *true civil rights* when he said: "In view of

the attitude expressed by the prosecuting attorney of the State of Georgia, what becomes of the 'presumption' or 'assumption' that the accused will be granted a fair and impartial trial and will be protected from mob violence? There can be no presumption of protection for the accused from murderous violence when the prosecuting attorney—charged with the duty of insuring this protection—expresses such bias and prejudice. A presumption of this kind, no matter how strong, cannot survive against the overwhelming force of known facts . . . We feel that the prosecuting authorities of the State of Georgia have created a most serious doubt that the life of the accused will be properly safeguarded, and that there will be a regular and orderly administration of justice. Any suggestion—no matter how slight—from the prosecuting authority itself which reasonably impels us to conviction that it may not enforce with scrupulous determination and even-handed justice the law against murder—which is the correct name for 'lynching'—, can be met only by such action of this court as will protect the petitioner from probably mob violence or death."

While there has been no such expression of bias on the part of the representative of Georgia who handled this case in our Courts, the actions of the Georgia prison warden and guards who had, and probably will still have, jurisdiction over Edward Brown speak louder than words.

As we would not extradite to a Soviet-dominated country a fugitive for whom, (without benefit of trial,) a Siberian exile, the salt mines, or a firing squad waited, so should we not, on the appalling record of brutality in this case, extradite even to a sister State an American citizen who has suffered the treatment which one of our Courts has already judicially heard and judicially appraised as inhuman.

Cruel and unusual punishment is prohibited by the United States Constitution; it is prohibited by the Constitution of Pennsylvania; it is prohibited by moral law and natural law. In a finding which has not been molested, the court below declared that Edward Brown has received cruel and unusual punishment and that if he is returned to Georgia there will be laid on his back further cruel and unusual punishment. In fact, the Party Respondent State of Georgia has admitted this in its brief: "Appellant [Edward Brown] alleged and proved to the satisfaction of the hearing judge that he has been subjected to cruel and unusual punishment while imprisoned in the State of Georgia, and *that it is likely that he will be again subjected to such punishment if returned to the State of Georgia.*" How can we, therefore, in the face of this factual adjudication order Edward Brown into a condition or state of circumstances *absolutely prohibited* by the law of the land?

Edward Brown is entitled to due process of law. In *Moore v. Dempsey,* 261 U. S. 86, 90, Justice OLIVER WENDELL HOLMES speaking for the Court said: "It was recognized of course that if in fact a trial is dominated by a mob so that there is an actual interference with the course of justice, there is a departure from due process of law; and that 'if the State, supplying no corrective process, carries into execution a judgment of death or imprisonment based upon a verdict thus produced by mob domination, the State deprives the accused of his life or liberty without due process of law.'" Whether due process of law is prevented by the intervention of a mob or by thugs masquerading in the name of the law, the result is the same: due process is paralyzed.

The Majority Opinion, commenting on the lower court's declaration that the prisoner if returned to the custody of Georgia would be subjected to the same cruel

and unusual punishment previously inflicted upon him, says that "this latter foreboding would seem open to grave question" because, it goes on to say, an amended Constitution of Georgia in 1945 and certain Acts of the Georgia Legislature in 1943 and 1946 banned cruel and unusual punishments and that regulations promulgated by the State Board of Corrections in 1946 prohibited corporal punishment or the manacling of prisoners, "and in general provided for a humane administration of the prisons and work camps in the State."

This observation by the Majority Opinion almost approaches naivete' because most of the savage and barbarous cruelties inflicted upon Edward Brown occurred *after* the amendment to the Georgia Constitution, *after* the Acts of the Legislature referred to, and *after* the promulgation of humane regulations by the State Board of Corrections.

In its apparent desire not to believe that such brutal and savage treatment (as was proved in this case) could be inflicted on human beings in America the majority is willing to push aside the record, from the pages of which one can almost hear the moans and groans of the victims of chain gang peonage. The "stretching" barbarity, to which I have already referred, occurred in 1949, four years after the Amended Constitution of humanity went into effect. I will quote a little more from the record on that harrowing episode: "Q. How long did they keep you in this stretcher? A. Just as long as you was breathing. If you blank out, they probably let you out. Q. Did you blank out? A. Yes, sir; I did. Q. Were you in this stretcher only once? A. Twice. Q. When was the first time? A. Right after my sister came to visit me in '49. Q. What month in 1949? A. She came on the 5th of July to visit me in '49. Within a week after she visited me they had me stretched in there. Q. Why? A. Because I had come

out of the sweat box, and she was crying about it and I told her to hush because I didn't want her to get into anything or people doing anything to her on my sakes."

The wrist-hanging incident occurred in 1948.

The revolting "staking" episode occurred in 1949. After the prisoner described an obscenity committed on him by the warden's boy, the prisoner testified: "Q. About how old? A. He is 12 years old. Q. At that time? A. At that time he was. Q. That was when? A. That was in 1949. Q. About what month? A. That was in August. Q. August? A. August of 1949. Q. Was it a bright, sunshiny day? A. Yes, sir; it was. Q. Did the sun pour down on you? Were you face up? A. My face up, I was laying flat on my back and my face up. The sun was boiling very hot and the syrup, it was sticky, and they turned the dogs loose on me; they was licking the syrup and biting and growling and doing everything. Q. Biting. A. Yes, they did. Here is a scar across my face here where it left, and one on my nose where the dog scratched and bit me."

The Majority's observation that these things cannot occur to the prisoner upon his return because the Constitution and the laws forbid it, is like the young lawyer telling his client through the bars of a prison cell: "They can't put you in jail for that."

The Majority Opinion also places a great deal of confidence in J. B. Hatchett, the Assistant Director of the State Board of Corrections of the State of Georgia, and states that Hatchett has given assurances "that if the relator were returned he would not be subjected to any cruel or unusual punishment whatever." Why? Hatchett's testimony was heard by the lower court and it was evaluated with all the other testimony. And after such evaluation, the court solemnly proclaimed, in spite of Hatchett's assurances, that

Brown, upon being returned to Georgia, would "likely again" be subjected to cruel and unusual punishment.

This same Assistant Director of the State Board of Corrections testified: "I visit each prison camp in the State at least once a year. There may be some I wouldn't get to." What would be happening to Brown if he was in a prison camp that Hatchett "wouldn't get to." And what could be happening to Brown during the many months in the year when Hatchett was not around, assuming that Hatchett would eventually get around once a year to that camp?

Hatchett testified that the riveting of picks had been "prohibited" in 1946, but several witnesses testified that prisoners were wearing picks during 1947, 1948, 1949, 1950 and 1951, and scarred ridges around former prisoners' ankles were exhibited to the court below.

On April 13, 1953, Hatchett's immediate superior, R. E. Warren, Director of State Board of Corrections of Georgia, sent a rather revealing letter to all the wardens in the State. Two significant paragraphs are quoted: "Since April of last year the Federal Bureau of Investigation of the Savannah office has been conducting an investigation as to alleged mistreatment of prisoners in one of our institutions. . . . We have incurred the wrath of the Department of Justice in Washington and they are working through the Federal Bureau of Investigation to embarrass us in every way they can and we want to keep our house in order so they will have no grounds or reasons for conducting the unfair investigation as they have in the incident in Savannah."

The Majority's apparent conclusion that chain gangs are a thing of the past in Georgia can only come from some knowledge not contained in the record, the

source of which, however, has not been divulged. In this respect the Court could take judicial knowledge of the fact that as late as August 13, 1951, a Georgia judge, the Honorable PALMER W. HICKS of City Court, Dublin, Georgia, in appearing before a sub-committee of the United States Senate Committee on Labor and Public Welfare, testified to facts regarding the sentencing of defendants to the "chain gang" in Georgia's penal system. The County Attorney of Dublin, Georgia, Carl K. Nelson, at the same hearing on August 13, 1951, made direct reference to the chain gang: "Senator Humphrey: Then it must have been the sheriff who sent him to the *chain gang*. Mr. Nelson: The State penal board which handles the prisoners sent an order down there to send him on to the *chain gang*." (Hearing before Special Sub-Committee, Committee on Labor and Public Welfare, United States Senate, August 13, 1951, 91934, Government Printing Office, 1951; Emphasis supplied.)

The Majority Opinion cites three decisions of this Court in support of its position. It begins with the case of *Com. ex rel. Henderson v. Baldi,* 372 Pa. 463, 466. That case, in my opinion, is where the trouble started. Mr. Justice JONES, speaking for the Court, said that: "Under the Uniform Criminal Extradition Act of July 8, 1941, P. L. 288, 19 PS §191 et seq., the extent of the proof required to sustain a State's requisition of another State for the extradition therefrom of a fugitive from justice is that the subject of the extradition is charged with a crime in the demanding State, that he was present in the demanding State at the time of the commission of the crime charged, that he is a fugitive from the demanding State and that the requisition papers are in order."

I do not find anything in the Uniform Criminal Extradition Act to support the conclusion in the above

statement that the Court is restricted to considering identity and presence of prisoner and regularity of requisition papers. The asylum State is not merely a paper-checking agency. No sovereign State worthy of sisterhood in our great Union, which was formed inter alia to "establish justice," would order extradition, no matter how regular the requisition papers might be, if it was definitely known that that person was to be subjected to injustice in the demanding State.

Mr. Justice JONES speaking for the Court, said further in the *Henderson* case that: "All that the present appellant avers in support of his petition for a writ of habeas corpus is that, if he is returned to Georgia, he will be subjected to cruel and unusual punishment. He does not in any way impeach the extradition proceedings nor has he controverted a single one of the facts upon which the requisition papers are based."

Mr. Justice JONES apparently treated the petitioner's claim very lightly when he said that *all* that the petitioner claimed was that if returned to Georgia he would be subjected to *cruel* and *unusual punishment*. Was that a minor complaint? Was that insignificant? Is it nothing if a petitioner claims, as he does in the case at bar, that if returned to Georgia he will be shackled, beaten, broiled, stretched and thrown to snakes and drowning waters? Is that not something properly to complain about in a court of justice?

*All* that the petitioner complained about in the case of *Com. ex rel. Mattox v. Supt. of County Prison,* supra, was that if returned to Georgia he would be lynched. And on that complaint, which was proved to have factual support, the Superior Court bravely and legally released Mattox, even though he did not controvert a "single one of the facts upon which the requisition papers" were based.

In the *Henderson* case, which is the shaky foundation upon which the Majority rests its momentous decision in this case, Mr. Justice JONES said: "It is unnecessary, however, for us to consider the errors alleged. None of them charges any irregularity in the extradition proceedings and that is all that can presently concern us." But there is much more that should concern us. In the statement just quoted, it is obvious that Mr. Justice JONES utterly ignored Section 4 of the Interstate Extradition Act which says: "When a demand shall be made upon the Governor of this State by the executive authority of another state for the surrender of a person so charged with crime, the Governor may call upon the Attorney General or any prosecuting officer in this State to investigate or assist in investigating the demand and to report to him the situation and circumstances of the person so demanded and *whether he ought to be surrendered."*

"Whether he ought to be surrendered" obviously imports that if there is any circumstances which, in law, morals, decency and justice, argues effectively against extradition, the extradition is to be denied. Thus, there is more than the technical adequacy of the extradition proceedings to be considered. There is the life of a citizen to be considered. The *Mattox* case, as already stated, did not stop at a mere scanning of the extradition papers. The Superior Court wanted to *know* what was to happen if Mattox was returned to Georgia, and when it ascertained that he would likely be lynched upon return to the demanding State, it refused the extradition. The Majority Opinion here does not repudiate that decision and, unless and until it does, this present adjudication must stand out, in my opinion, as a denial of due process.

If, in a given case, the facts should reveal that a lynching party is waiting for the prisoner at the State

border, all the regularity and sufficiency of the extradition papers would not justify a Court in sending that prisoner to an outlawed, illegal and violently anti-Constitutional doom. In point of majesty of the law, charged as it is with upholding the dignity, the freedom and the well-being of man, I see no distinction between the lynching of a helpless mortal and the pressing down upon him of a yoke of misery and an harness of torture by inhuman tormentors operating under the medieval and barbarous system known as the "chain-gang."

It is my firm conviction that under the provisions of the Interstate Extradition Act and the Habeas Corpus Act of 1937, as well as the decisions of the Supreme Court of the United States and the stare decisis of *Com. ex rel. Mattox v. Supt. of County Prison,* supra, Edward Brown is entitled to be released. But since the majority is of the contrary view and believes that it is compelled by the decisions to deny the relief prayed for in the petition for writ of habeas corpus, this Court still has a limitless reservoir of power from which it can draw the necessary authority to save the relator from the horrible fate which, according to the record, awaits him in Georgia.

In the case of *Commonwealth v. Onda,* 376 Pa. 405, Andrew Onda, who was convicted in the Court of Oyer and Terminer of Allegheny County of violation of the State Sedition Act of 1919, petitioned this Court to prohibit the Trial Judge from sentencing him until he should be released from the hospital in which it was claimed he was then staying in New York. Onda claimed that he had a heart condition which would endanger his life if he were returned to Pittsburgh for sentencing. The Trial Judge had refused Onda's petition for a stay of sentence based on the same affidavits which were presented to this Court, and had decided

536

that Onda was in no greater danger from a fatal stroke from his malady in prison than he would be in New York. Over two years had already elapsed from the date of conviction. After stay of sentence had been refused, Onda came to this Court instead of appealing to the Superior Court, which of course is the next higher court in the hierarchy of appeal in criminal cases, excepting homicide cases. In presenting his ,original petition to this Court he gave no notice to the District Attorney nor to the Trial Judge. This Court * held that it had jurisdiction to entertain the application and, speaking through the Chief Justice, declared that this Court possessed all the powers which were possessed by the British King's Bench over two centuries ago: "More than two centuries ago section XIII of the Act creating the Supreme Court of this Commonwealth (Act of May 22, 1722, 1 Sm. L. 131) provided that the court should 'minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas, and Exchequer, at Westminster, or any of them, may or can do.' "

It seems to me that when we realize the unbudgeable fact that the year 1722 in point of chronology, law jurisprudence, allegiance and loyalty, *precedes* 1776, this Court can not claim a power which was held by a Court beholden to the British Crown. The Declaration of Independence severed all ties with the British Empire. This Court, as I view it, has only those powers which are granted by the Pennsylvania Constitution of 1874, which is the organic law of the

---

* Justice BELL dissented from the Majority decision. Justices ARNOLD and MUSMANNO did not participate in the decision.

Commonwealth of Pennsylvania. There is nothing in the Constitution of 1874 which gives to the Supreme Court of Pennsylvania the power it claimed in the case of *Commonwealth v. Onda,* supra.

However, since the law of Pennsylvania is what the Supreme Court says it is, unless changed by Constitutional amendment or Act of Assembly, the Supreme Court *does* now possess powers equivalent to those once exercised by the Court of King's Bench. What are those powers? They were defined by Sir William Blackstone in Book 3, ch. 4 p. 42: "The jurisdiction of this court [Court of King's Bench] is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. . . It protects the liberty of the subject, by speedy and summary interposition."

Since the Supreme Court does, therefore, possess limitless power to protect "the liberty of the subject" and to see that justice is done, why does it not draw on that power in this case?

This Court in the *Onda* case commented upon the "emotional shock" Onda would suffer upon "being sentenced to court to the term in prison to which defendant would undoubtedly have been subject."

It appears to me that Edward Brown will suffer more than an "emotional shock" when he is returned to the stretching, broiling, wrist-hanging, beating and chained rigors which probably await him in Georgia, as pointed out in the court below.

If this Court can use the limitless powers of the King's Bench to save a convicted Communist revolutionary from the sentence he deserves, why can it not use that power to save the wretch in this case who, according to sworn evidence, is being doomed to a

538

punishment absolutely prohibited and condemned by the Constitution of our Commonwealth and the Constitution of the United States of America?