Argued June 17, affirmed October 15, petition for rehearing denied
November 12, 1970, petition for review denied January 12, 1971

WILLIAM THOMAS STEWART, *Appellant, v.*
STATE OF OREGON, *Respondent.*

475 P2d 600

*Gary D. Babcock,* Public Defender, Salem, argued
the cause and filed the brief for appellant.

*Gary D. Gortmaker,* District Attorney, Salem,
argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and FOLEY and
BRANCHFIELD, Judges.

FOLEY, J.

Petitioner appeals from a judgment dismissing his application for a writ of habeas corpus. He sought the writ in order to prevent his extradition to the State of Mississippi where he had escaped from prison.

Mississippi initiated the extradition proceedings, asking that petitioner be returned to that state to serve the remainder of a 20-year sentence resulting from his conviction for manslaughter, plus a sentence of 18 months for one escape from prison and in addition a sentence of one year for a subsequent escape from prison.

On September 18, 1969, after demand had been made by the Governor of Mississippi, the Governor of Oregon signed a Warrant of Arrest and Extradition authorizing petitioner's return to Mississippi. Three days prior to this, petitioner had filed an application for a writ of habeas corpus, seeking release from the custody of the sheriff of Marion County, Oregon, who now detains him pursuant to the governor's warrant. Petitioner's application alleges cruel and inhuman treatment in the Mississippi prison, and claims that if petitioner is returned there he will be murdered by trusty-inmates of the prison. The circuit court held a hearing on the application for the writ, but ruled that the only proper question for its determination was whether the petitioner was the same person named in the extradition warrant. Petitioner concedes he is the same person designated in the warrant.

As pointed out by petitioner in his brief, the Oregon Supreme Court, in *Storms v. Lambert*, 224 Or 189, 355 P2d 766 (1960), held that the only issue to be decided in an extradition proceeding is the validity of

the prisoner's arrest. The court reiterated that it would not look behind the warrant or inquire into the guilt or innocence of the fugitive. In *Fisco v. Clark*, 243 Or 466, 414 P2d 331 (1966), the petitioner, accused of murder in Louisiana, was in custody pursuant to a governor's warrant of extradition He sought a writ of habeas corpus, claiming he would be denied the due process and equal protection guaranteed by the Fourteenth Amendment to the United States Constitution if he were extradited to Louisiana The Oregon Supreme Court ruled that it would not entertain an imputation that the courts of the demanding state would disregard the rights of the accused but would instead assume that the demanding state would accord to the accused all the rights and privileges to which he was entitled. More recently, in *Mays v. Shields*, 251 Or 168, 444 P2d 949 (1968), the court held, in a hearing on a petition for a writ of habeas corpus, that it is not the function of the Oregon court to examine the motives or possible unlawful purpose of those seeking extradition.

This court is bound by the decisions of the Supreme Court of Oregon. Its holdings preclude any inquiry by this court such as that proposed by petitioner here. Oregon, the asylum state, will not attempt to sit in judgment in this case on the criminal processes and penal administration of its sister state. However, it may well be that other avenues of relief are open to petitioner.

The right to extradition is provided by the United States Constitution, Art IV, § 2, which reads in part:

"A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of

the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

A Comment in 74 Yale L J 78, entitled Extradition Habeas Corpus, discusses the conflict between two constitutional principles, " 'one promoting efficiency and comity between states [U.S. Const. Art. IV, § 2], [and] the other protecting fundamental rights of the individual [U.S. Const. Amend. XIV, § 1].' " The following portion of that discussion throws light on the role of state courts in extradition proceedings.

"* * * Considerations of interstate comity suggest that this duty is more appropriately filled by the federal courts. These considerations, embodied in the extradition clause and the spirit of full faith and credit, should preclude a state court from sitting in judgment upon the criminal processes of sister states. The federal system is the source of the comity obligation of the states, however, and federal courts are not within the matrix of interstate comity. This is not to say that the federal courts may ignore considerations of interstate comity when rendering decisions which affect relations between states. But as national courts they are in a position to accommodate the demands of comity between the states to other national considerations —in this case, to the protection of individual constitutional rights. Furthermore, in extradition cases it is a federally established procedure—for which the federal courts should have a special responsibility—which is the source of the potential danger to individual rights. * * *" 74 Yale L J at 124.

Affirmed.

BRANCHFIELD, J.

I dissent.

As I read the majority opinion, it evinces concern for the petitioner's plight, but disclaims ability to act. It suggests resort to a federal court. But it seems to me that we have the same duty as does a federal court to enforce the rights guaranteed by the federal constitution. If a man is being deprived of his right to freedom from cruelty and depravity, the Oregon courts should grant him succor. If Mississippi officials are violating the constitution, they are doing so just as much when petitioner comes into our court as if he were in federal court.

It is argued that we cannot enforce our order against the officials of another state, if we find that petitioner has been subjected to cruel and inhuman treatment. My answer is that we can enforce our orders against the officials of this state who have the petitioner in custody. The duty enjoined upon us to prevent cruelty is at least as great as our duty to order the return of a fugitive to a sister state. Any interference with the processes of a sister state is no more than would result from similar action by a federal court. Comity does not require us to wink at the constitution.

In his application for a writ of habeas corpus, petitioner offered to prove that his sentence in Mississippi was void, as being in violation of the Eighth and Fourteenth Amendments to the United States Constitution in that he was subjected to cruel and inhuman punishment, and was denied due process of law and equal protection of the laws.

He offered to prove that the state of Mississippi has established and now maintains a prison system in which the prisoners are guarded, controlled, supervised

and disciplined by armed fellow inmates, most of whom are serving life sentences.

He offered to prove that the persons charged with the direct responsibility of supervision and discipline of rank and file inmates are fellow convicts whose status as trusties depends upon their demonstrated sadism and terrorism of the convicts under their immediate supervision.

He offered to prove that inmates are forced to perform an allotted amount of labor within an allotted time without reference to the ability of the inmates to perform the same.

He offered to prove that failure by a trusty inmate to administer excessive and sadistic punishment on a fellow inmate for not reaching arbitrary and unreasonable daily work quotas resulted in a loss of status to the trusty and often subjected him to physical punishment.

He offered to prove that failure to perform a certain amount of labor within a certain time resulted in an inmate being placed in "starvation." There an inmate is put into an isolated room in which the temperature is kept just above freezing. They are allegedly placed there naked and without blankets. He further alleged that they are given inadequate food and are forced to drink excessive quantities of milk of magnesia. He alleged that during the past year and one-half three inmates have died as a result of such treatment.

He offered to prove that the prisoners are subjected to unhealthful food and dietary conditions.

Most especially he offered to prove that if he is returned to Mississippi he will be murdered by two

trusties before he has an opportunity to avail himself of remedies available in the Mississippi courts.

He offered to prove those allegations by the use of depositions from named prisoners within Mississippi.

Perhaps those charges would have proved groundless had Stewart been given a hearing. But if they are true, the return of Stewart to the conditions described would mock the prohibition by both the Oregon and United States Constitutions against cruel and unusual punishment.

The majority relies on Mississippi courts to protect the rights of the petitioner, citing several Oregon decisions. I grant that the language of those decisions is contrary to my position, but I point out that the Supreme Court has not previously been faced with the constitutional question present here. The requisition signed by the Governor of Mississippi requests surrender of Stewart in order that the governor's agent may "receive and return the said fugitive to the Mississippi State Penitentiary at Parchman, Mississippi." We cannot assume that Stewart will have access to the courts on his return. His allegations are that he has been subjected to cruel and inhuman treatment *after* trial and that he will receive more of the same. If he is telling the truth, personnel in the prison will have both the incentive and opportunity to prevent him from receiving the attention of the courts. We are not here concerned with courtesy to or reliance upon the courts of another state, but with possible impending brutality and murder.

*Sweeney v. Woodall,* 344 US 86, 73 S Ct 139, 97 L Ed 114 (1952), is frequently cited in extradition habeas corpus decisions which deny relief. *Sweeney* is au-

thority for the rule that a petitioner is required to exhaust his remedies in the courts of the state which allegedly mistreated him before asking federal intervention. The petitioner there alleged that if extradition was granted, he would again be abused and mistreated on his return to Alabama. The Supreme Court nevertheless allowed extradition, relying upon the Alabama courts to protect him. But at the time of that opinion, the Supreme Court had not yet clearly enunciated the doctrine that the Fourteenth Amendment to the United States Constitution requires the states to refrain from violating the Eighth Amendment, which proscribes cruel and unusual punishments. Nor had it recognized the fallacy of requiring exhaustion of state remedies, which it did in *Fay v. Noia*, 372 US 391, 83 S Ct 822, 9 L Ed 2d 837 (1963).[①]

It is hard to understand how the court which freed a Philippine prisoner in *Weems v. United States*, 217 US 349, 30 S Ct 544, 54 L Ed 793 (1910), because he was sentenced to imprisonment and subject to "cadena," could later, in *Sweeney*, hold as it did. The chains of the cadena are clearly cruel and unusual punishment, but no less so are the conditions alleged in *Sweeney* and many other cases, including this one.

The dissenting opinion of Musmanno, J., in *Commonwealth v. Baldi*, 378 Pa 504, 106 A2d 777, 781 (1954), eloquently expresses the reason for discarding the outmoded holding in *Sweeney*:

"It was because of the brutality visited upon mankind down through the centuries by monarchs

---

[①] *Noia* thoroughly reviewed the history and purposes of habeas corpus, and demonstrated that the "Great Writ" is today a vital and comprehensive one. It determined that courts have broad powers to hold evidentiary hearings to inquire into the facts of a petitioner's imprisonment.

and their hirelings that the patriot fathers of this Republic interdicted in the Constitution of the United States all forms of cruel and unusual punishment. This same injunction was made part of the Constitution of Pennsylvania. It is, therefore, a strange and anomalous thing to find that the highest tribunal in this Commonwealth, where liberty in America drew its first breath of life, should order a citizen of the United States out of the confines of Pennsylvania and back to an incredulous realm where chains and the other trappings of tyrannical punishment must surely await him."

Some courts have tried from time to time, with little success, to overcome the stranglehold imposed by *Sweeney* upon reason and the enforcement of constitutional rights. In *Johnson v. Dye,* 175 F2d 250 (3d Cir 1949), petitioner alleged that he had been subjected to cruel and unusual punishment in the past and that he would be murdered if he were returned to Georgia. The court found that he had, in fact, been treated cruelly, that such treatment was a violation of the Fourteenth Amendment, and that petitioner was entitled to be released. The United States Supreme Court reversed the decision solely on the ground that Johnson had not exhausted his state remedies. *Dye v. Johnson,* 338 US 864, 70 S Ct 146, 94 L Ed 530 (1949).

In *Application of Middlebrooks,* 88 F Supp 943 (SDDC Cal 1950), petitioner alleged that his sentence violated the Fourteenth Amendment in that it subjected him to cruel and unusual punishment. In answering the issue of whether the court could look into the facts alleged, the court stated at page 947:

"* * * Upon application for a writ the court must inquire at petitioner's request into all the facts going to:

"'* * * the very truth and substance of the causes of his detention, although it may become

necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to judgment against him \* \* \* *it is open* to the courts of the United States, upon an application for a writ of habeas corpus, to look beyond forms and inquire into the very substance of the matter \* \* \*.' Frank v. Mangum, 1915, 237 US 309, 330-331, 35 S Ct 582, 588, 59 L Ed 969, 981." (Emphasis supplied.)

In *Middlebrooks* the court discussed the interplay between the Fourteenth Amendment, Art IV, § 2 of the United States Constitution and the Uniform Extradition Act. The court wrote at page 953:

"Neither the Uniform Extradition Act of the State of California, Nor Article IV, § 2, Clause 2 of the Constitution of the United States Nor the Acts of Congress, Regulating Interstate Extraditions, Prevail Over the Fourteenth Amendment.

"The proposed rendition of the prisoner by California is pursuant to the compact to effect rendition of persons 'charged in any State with Treason, Felony, or other Crime,' contained in Art. IV, § 2, Clause 2 of the U.S. Constitution. But Art. IV does not require rendition which violates the Fourteenth Amendment of the same Constitution. \* \* \*"

The Ninth Circuit reversed the district court in *Ross v. Middlebrooks*, 188 F2d 308 (1951), by applying the now discarded rule[②] of *Darr v. Burford*, 339 US 258, 70 S Ct 587, 94 L Ed 761 (1950).

It is clear that past immunity from judicial intervention has fostered situations which have shocked the conscience of the courts and thus have triggered

---

[②] *Darr v. Burford* was overruled by *Fay v. Noia*, 372 US 391, 83 S Ct 822, 9 L Ed 2d 837 (1963), to the extent that it barred a state prisoner from habeas corpus relief if he had failed timely to seek certiorari in the United States Supreme Court from an adverse state decision.

sometimes reluctant intervention. *State ex rel Francis v. Resweber*, 329 US 459, 67 S Ct 374, 91 L Ed 422, 426 (1947), began the application of the Eighth Amendment to state action when it said:

> "* * * Prohibition against the wanton infliction of pain has come into our law from the Bill of Rights of 1688. The identical words appear in our Eighth Amendment. The Fourteenth would prohibit by its due process clause execution by a state in a cruel manner."

*Resweber* was followed some years later by *Robinson v. California*, 370 US 660, 666, 82 S Ct 1417, 8 L Ed 2d 758, 763 (1962), where the court said:

> "* * * But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease [drug addiction] would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."

Reliance on the rule in *Robinson* has provided an outlet for the troubled conscience of the courts. In *Talley v. Stephens*, 247 F Supp 683, 687 (DC Ark 1965), it was said:

> "In this connection the court has no difficulty with the proposition that for prison officials knowingly to compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment to the Constitution of the United States as included in the Fourteenth Amendment. See Robinson v. California, 370 US 660, 82 S Ct 1417, 8 L Ed 2d 758."

In *Wright v. McMann*, 387 F2d 519 (2nd Cir 1967), allegations by an inmate that he was put in soli-

tary confinement in a filthy, unsanitary, unheated cell containing only a toilet and sink which were encrusted with dirt and human excremental residue, that the occupant was required to remain nude in subfreezing weather, and that he was denied soap, towel, toilet paper, tooth brush and other hygienic implements and supplies were found to be cruel and inhuman treatment, and held sufficient to require an investigation by the trial court into the facts.

*Resweber, Robinson, Talley* and *Wright* do not deal with requests for extradition. The courts involved were federal courts. But reliance by state courts upon those distinctions is an avoidance of responsibility. Conduct alleged by petitioner in this case is similar to conduct heretofore declared to be cruel and unusual punishment and in violation of the Eighth Amendment as applied to the states by the Fourteenth Amendment. He should have been given an opportunity to present his case.

There is an apparent dilemma facing a state court which seeks to deal with alleged constitutional violations by another state. The United States Constitution, Art IV, § 2, Cl 2 requires an asylum state to deliver up a fugitive to a demanding state. It is generally recognized that the executive in the asylum state may refuse to issue a rendition warrant. It has been assumed that state courts do not have corresponding power so long as (1) the documents received from the demanding state are in order and are certified to by the governor, (2) the petitioner is the person referred to in those documents, (3) the documents substantially charge petitioner with a crime, and (4) the petitioner is a fugitive from the demanding state. State courts should be as conscious as are state governors of the

need to provide protection against unconstitutional punishment. When a fugitive from another state comes into Oregon courts and pleads sanctuary from unconstitutional treatment, our courts should be as free as the governor to determine, under all the facts, whether that sanctuary should be assured. That duty is imposed upon the courts by the supremacy clause of the United States Constitution, Art VI, § 2, which says:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereof, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The United States Constitution is the supreme law of the land. It prohibits cruel and unusual punishments. The judges in every state are bound by that constitution. It therefore becomes our duty to protect a petitioner from future state action in contravention of the constitution, if he can prove that illegal state action will be taken upon his return to that state.

In fairness to the state of Mississippi, I must make it clear that I do not by this opinion credit Stewart's charges; I do no more than say he should have been given an opportunity to prove them. Cf *Newton v. Cupp,* 3 Or App 434, 474 P2d 532 (1970). I am aware that prisoners are sometimes prone to make whatever charge they have reason to believe will get them a hearing, with little or no regard for the truth of their allegations. But courts are established to hear complaints and to give heed to all those which have substance, however small may be the proportion of those which have merit. The fear of hearing base-

less charges should not deter the courts in conducting their inquiries.

I would reverse and remand in order to give the petitioner an opportunity to offer proof.