## Commonwealth ex rel. Mattox *v.* Superintendent of County Prison, Appellant.

Argued March 9, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ. (RENO, J., absent).

*Franklin E. Barr,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellant.

*Raymond Pace Alexander* and *Edward Shippen Morris,* with them *J. Schneyer Clearfield* and *Joseph A. Palmer,* for appellee.

*A. D. Caesar,* with him *C. W. Revise,* for Philadelphia Chapter of the National Lawyers Guild, amicus curiae.

*Joseph A. Palmer,* for American Civil Liberties Union, amicus curiae.

OPINION BY KELLER, P. J.; April 16, 1943:

This is an appeal by the Superintendent of the Philadelphia County Prison, on behalf of the Commonwealth, from an order of the Court of Quarter Sessions of Philadelphia County discharging from custody Thomas Mattox, the petitioner for a writ of habeas corpus, on his entering bail in the sum of $200 for his appearance when wanted.

Mattox, a colored boy, sixteen years old on July 11, 1942, when his alleged crime was committed, was arrested by virtue of a warrant issued by the Governor of this Commonwealth pursuant to a request for his extradition by the Governor of the State of Georgia, to answer a charge of assault with intent to kill one Wilbur J. Cornell, a white boy, nineteen years old.

On July 18, 1942 this petition for writ of habeas corpus was filed by him and the writ was issued the same day.

A hearing, pursuant to the writ, was had before Judge FENERTY on July 24, 1942 and an adjourned hearing on October 14, 1942, at which hearings the testimony of Wilbur Dye, jailor of Elbert County, Georgia, and G. H. Cleveland, a police officer of said county, both of whom had been commissioned by the Governor of Georgia to procure the extradition of the relator, and of Mark Cleveland, a deputy sheriff of said county, was taken on behalf of said State, accompanied by numerous affidavits in support of said extradition, and the testimony of the relator's two sisters, Emmie Mahaly Mattox and Gussie Anita Mattox, who were present at the commission of the alleged

crime, and his mother, Sallie Mattox, and his brother, John Mattox, who were not present at nor concerned in the alleged assault, was taken on relator's behalf.

The ground on which the writ of habeas corpus was sought was that the state of feeling against the relator in Elbert County, Georgia, is so high that a fair and impartial trial could not be given him, and that, if returned, he would be in grave danger of being lynched.

After hearing the testimony adduced on both sides and giving full consideration to the matter, Judge FINERTY held that the evidence supported the relator's position; that it sustained the averment that the feeling against him was so high that he would not be accorded a fair and impartial trial and that he would be in grave danger of being lynched if he were returned; and that the attitude of the prosecuting official and the peace officers of the county indicated a curiously 'complacent' attitude on their part with respect to mob violence and even lynching. He accordingly ordered the relator to be discharged from custody upon his entering bail in the sum of $200 for his appearance when wanted. The superintendent of the prison appealed.

Our law makes no provision for an *appeal* from an order in habeas corpus proceedings, except where the custody of children is involved (Act of July 11, 1917, P. L. 817),[1] in which cases this court is directed to consider the testimony "and make such order upon the merits of the case ...... as to right and justice shall belong." In all other habeas corpus cases, the appeal is in the nature of a *certiorari* under which the appellate court reviews the *record* made in the court below only to determine whether that court had jurisdiction and the proceedings were regular and in conformity with law: *Com. ex rel. Flower v. Supt. of County Prison*, 220 Pa. 401, 408, 69 A. 916; *Com. ex rel.*

---

[1] Before that Act, see *Com. ex rel. McDougall v. McDougall*, 203 Pa. 291, 52 A. 254.

*Spivak v. Heinz, Sheriff,* 141 Pa. Superior Ct. 158, 14 A. 2d 875; *Independence Party Nomination,* 208 Pa. 108, 111, 57 A. 344. "This writ [certiorari] brought up the record in any given case for review and correction, but it brought the record only ...... The errors to be corrected must appear on the face of the record ...... and the merits cannot be inquired into upon this writ, but are left to the judgment of the court below": *Rand v. King,* 134 Pa. 641, 645, 19 A. 806. Before the Act of April 18, 1919, P. L. 72, the evidence formed no part of the record proper, and for that reason was not examined on certiorari. Since that act, "while we may not review the merits of the case or inquire whether the judgment of the court below was correct, under the evidence, as that would be making the certiorari an appeal", we may examine the evidence sent up with the record in such cases to test the right of the court to make the order complained of: *Sterrett v. MacLean,* 293 Pa. 557, 560, 143 A. 189; not to weigh conflicting evidence, but to determine whether the order appealed from is supported by any evidence and whether the court had jurisdiction to do the act complained of: *Walker's App.,* 294 Pa. 385, 389, 144 A. 288; *Hand's Case,* 266 Pa. 277, 280, 109 A. 692; *Revocation of Mark's License,* 115 Pa. Superior Ct. 256, 263, 176 A. 254.

With this limitation of the right of review, we shall consider the case.

By the Act of April 4, 1837, P. L. 377, sec. 2, 17 PS §502, the same jurisdiction in habeas corpus proceedings was conferred on the Court of Quarter Sessions of Philadelphia County and the several judges thereof as had been previously given the judges of the court of common pleas by the Act of February 18, 1785, 2 Sm. L. 275.

Section 10 of the Uniform Extradition Act of July 8, 1941, P. L. 288, 290 19 PS §191.10, specifically provides that the prisoner, whose extradition is sought, shall have the right to apply for a writ of habeas

corpus. Unlike the provisions of section 2 of the Act of May 24, 1878, P. L. 137, as amended by Act of June 4, 1879, P. L. 95, both of which were repealed by Act of April 21, 1927, P. L. 327, the Act of 1941 does not limit the investigation and hearing under the writ of habeas corpus to the question of identification. The Act of July 1, 1937, P. L. 2664, 12 PS §1893, provides that the judge granting the writ of habeas corpus "may inquire into the facts of the case". We do not understand from this that on habeas corpus, following extradition proceedings, the judge granting the writ may inquire into the guilt or innocence of the accused, for that is solely the function of the court of the demanding State having jurisdiction of the information, indictment, etc. But it does mean that the judge granting the writ of habeas corpus may inquire into the facts averred as ground for the relator's claim that he should not be delivered over to the representatives of the demanding State.

That leaves for our consideration on this certiorari only two other questions:

(1) Is a charge, proved to the satisfaction of the judge granting the writ of habeas corpus by sufficient, competent evidence, that by reason of the feeling existing against the accused relator in the county of the demanding State having jurisdiction of his alleged offense, he will be unable to obtain a fair trial and will be in grave danger of being lynched, a valid reason for refusing to turn him over to the representatives of the demanding State and discharging him from custody?

(2) If the foregoing is answered affirmatively, was there sufficient, competent evidence in this case to warrant the action of the judge in discharging relator on his giving bail for his appearance when wanted?

On the first question, we think the decisions of the Supreme Court of this Commonwealth and of the Supreme Court of the United States, by necessary implica-

tion, hold that where there is sufficient competent evidence to sustain a charge that the accused relator will be unable to have a fair trial and will be in grave danger of being lynched if returned to the demanding State for trial, the judge hearing the writ of habeas corpus may refuse to give him over into the custody of its representatives.

In *Marbles v. Creecy*, 215 U. S. 63, where the Supreme Court affirmed the order of a judge of the Circuit Court of the United States refusing to discharge the relator, who had been indicted in Mississippi for having made an assault on another man with intent to murder him, and whose extradition had been asked of the Governor of Missouri and honored by him, Mr. Justice HARLAN, speaking for the court, said: "It is clear that the executive authority of a State in which an alleged fugitive may be found, and for whose arrest a demand is made in conformity with the Constitution and laws of the United States, need not be controlled in the discharge of his duty by considerations of race or color, *nor by the mere suggestion—certainly not one unsupported by proof, as was the case here—that the alleged fugitive will not be fairly and justly dealt with in the State to which it is sought to remove him, nor be adequately protected, while in the custody of such State, against the action of lawless and bad men.* The court that heard the application for discharge on writ of *habeas corpus* was entitled to assume, as no doubt the Governor of Missouri assumed, that the State demanding the arrest and delivery of the accused had no other object in view than to enforce its laws, and that it would, by its constituted tribunals, officers and representatives, see to it not only that he was legally tried, without any reference to his race, but would be adequately protected while in the State's custody against the illegal action of those who might interfere to prevent the regular and orderly administration of justice."

(pp. 69, 70). But the excerpt above, underlined or italicized by us, implies that if the charge or averment on behalf of the relator was not "a mere suggestion, unsupported by proof", as in that case, but had been established to the satisfaction of the judge, who granted the writ of habeas corpus, and who pursuant to law, had inquired into the facts alleged, it would have been a sufficient ground for releasing the relator from custody and refusing to deliver him up to the representatives of the demanding State.

And in *Com. ex rel. Flower, Appellant v. Supt. of Phila. County Prison,* 220 Pa. 401, 411, 69 A. 916, affirming the judgment of this court in 33 Pa. Superior Ct. 594 (RICE, P. J.), Mr. Justice MESTREZAT, speaking for the Supreme Court of Pennsylvania, said: "He [relator, appellant] does not claim that there is any prejudice existing against him in that state [New York] or that he cannot have a fair and impartial trial in that jurisdiction for the crime charged there against him". The only meaning possible from that sentence is that if the relator, appellant, had not only claimed but had actually proved that there existed against him in New York such prejudice as to prevent his having a fair and impartial trial in that state, his appeal would have been sustained.

Recent decisions of the Supreme Court of the United States, in which judgments affirmed by the highest courts of a number of states were reversed, show that in enforcing the due process clause of the 14th Amendment to the Federal Constitution, the Supreme Court will take notice of racial discrimination shown to have been present at the trial to such an extent as probably to have prevented a fair and impartial trial. For example, in *Powell v. Alabama,* 287 U. S. 45, 71, the court emphasized the existence of 'public hostility' against the defendants, in passing upon their right to have counsel for their defense. In *Pierre v. Louisiana,* 306 U. S. 354, a conviction of murder was set aside

where the jury commissioners had excluded negroes from the lists of persons summoned for jury service in the state courts, notwithstanding the Supreme Court of that state had held that the evidence failed to establish that members of the negro race were excluded from the grand jury venire on account of race and that the trial court's finding of discrimination was erroneous; and the Supreme Court of the United States said (p. 358) : "When a claim is properly asserted—as in this case—that a citizen whose life is at stake has been denied the equal protection of his country's laws on account of his race, it becomes our solemn duty to make independent inquiry and determination of the disputed facts." To the same effect, see *Smith v. Texas,* 311 U. S. 128, 130. In *Chambers et al. v. Florida,* 309 U. S. 227, the Supreme Court of the United States made its own inquiry and investigation and determined that in securing the conviction of four young negroes on a charge of murder the State had used confessions improperly obtained by repeated inquisitions of the defendants, without friends or counsellors being present, and under circumstances calculated to inspire terror. The opinion writer, Mr. Justice BLACK, called attention (p. 229) to the statement in the majority opinion of the Supreme Court of Florida that "It was one of those crimes that induced an enraged community ......" And reversals of judgments obtained under similar circumstances were entered in *Canty v. Alabama,* 309 U. S. 629 and *White v. Texas,* 309 U. S. 631.

A petition for rehearing in the last named case was denied in *White v. Texas,* 310 U. S. 530, and the court speaking by Mr. Justice BLACK reiterated its former ruling and said again, "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to death."

Counsel for appellee has drawn our attention to the case of *Frank v. Mangum,* 237 U. S. 309, where the Supreme Court of the United States affirmed the order of the District Court of the United States for the Northern District of Georgia, which had refused to issue a writ of habeas corpus, based on the petition of the relator, Leo Frank—who had been convicted of the murder of a girl employee, Mary Phagan—that he had not had a fair and impartial trial. Mr. Justice HOLMES (Mr. Justice HUGHES concurring) filed a dissenting opinion, (pp. 345-350) in which he laid stress on the hostility of the crowd of spectators in the courtroom and said, inter alia: "The argument for the appellee in substance is that the trial was in a court of competent jurisdiction, that it retains jurisdiction although, in fact, it may be dominated by a mob, and that the rulings of the state court as to the fact of such domination cannot be reviewed. But the argument seems to us inconclusive ...... Mob law does not become due process of law by securing the assent of a terrorized jury. We are not speaking of mere disorder, or mere irregularities in procedure, but of a case where the processes of justice are actually subverted ...... We do not think it impracticable in any part of this country to have trials free from outside control. But to maintain this immunity it may be necessary that the supremacy of the law and of the Federal Constitution should be vindicated in a case like this. It may be that on a hearing a different complexion would be given to the judge's alleged request and expression of fear. But supposing the alleged facts to be true, we are of opinion that if they were before the Supreme Court it sanctioned a situation upon which the Courts of the United States should act, and if for any reason they were not before the Supreme Court, it is our duty to act upon them now and to declare lynch law as little valid when practiced by a regularly drawn jury as when admin-

istered by one elected by a mob intent on death." The aftermath of that case is illuminating. The sentence of death was commuted to life imprisonment on June 21, 1915 by the Governor of Georgia, after which the following events occurred, as related in 10 American State Trials, pp. 412, 413.: "On July 17, 1915, Frank was attacked by a fellow convict who cut his throat with a butcher knife. He lingered between life and death for several weeks, but finally recovered.. At daybreak on August 17th, (1915), two miles northeast of Marietta, in Cobb County, Georgia, Frank was lynched by a mob. Mary Phagan's body was buried in the cemetery of this town. A number of men in automobiles arrived at the State Prison Farm where Frank was serving his commuted life sentence, after dark on the evening of August 16th. These men cut the telephone wires, overpowered the guards, entered the hall where Frank was sleeping, carried him into one of the automobiles, and the journey was made during the night all the way to Marietta, Cobb County, a distance of some 125 miles. Frank was hanged to a tree by this mob. The mob was dissuaded from burning the body by some citizens who arrived on the scene after the hanging ......" [2]

An ounce of prevention, in this respect, is worth a pound of cure; and we are of opinion that where the judge granting the writ of habeas corpus is satisfied by substantial and competent evidence that the feeling against the relator and the attitude of the prosecuting and peace officers of the demanding state is such as to furnish reasonable grounds for the belief that he will

---

[2] The same combination of an infuriated mob and a spineless or cowardly guard or peace officer was responsible for the blot on the escutcheon of this Commonwealth (Pennsylvania) when, some twenty-five or more years ago, a mob overpowered a guard placed over a wounded negro prisoner in a Coatesville hospital and lynched the helpless man.

not receive a fair and impartial trial and is in grave peril of being lynched or abused by mob action, he may discharge him from custody and refuse to deliver him over to the representatives of the demanding state. Had the Governor of Pennsylvania refused to honor the requisition on this ground, he could not have been compelled to do so: *Comth. of Kentucky v. Dennison, Governor,* 24 Howard (U. S.) 66, 110; *Taylor v. Taintor,* 16 Wallace (U.S.) 366, 370.

We come then to the final question. Was there sufficient, competent evidence in this case to warrant the action of the judge? We are of opinion that there is sufficient competent evidence in the record, if believed by the judge, to justify his action.

We are not the triers of fact, and it is not our province to weigh conflicting evidence and decide which witnesses should be believed. Our duty, in this respect, is only to determine whether the order appealed from is supported by substantial, competent evidence; and we hold that it is.

We shall, therefore, not review the evidence. It is proper to say, however, that Cornell's own affidavit shows that the first move towards physical force was made by him, when he went to the back of his own automobile and got out an automobile jack, with which to threaten or strike Mattox. But it is the circumstances that followed Mattox's flight or escape that were revealing in this case. Mattox's two sisters, who were with him in the automobile when the altercation with Cornell began and who testified they had been struck by Cornell before he was assaulted by relator, were arrested at once for felony and taken to jail and kept there for more than three months, when the charge was reduced to misdemeanor and they were released on bail.

Mattox's mother, who was not concerned at all in the altercation, went to Elberton, the county seat, to

try to get her daughters out of jail, and on the way home was pulled out of her automobile by four white men and severely beaten; and although the sheriff and his deputies heard of it, no steps were taken to apprehend or punish the criminals. At the hearing in October 1942 Mrs. Mattox testified that one of her assailants was Horace Flemming, a resident of Bowman, where Cornell lived. We have not been informed as to whether any steps have since been taken by the sheriff looking to his arrest and punishment. John Mattox, a brother of the relator, who was not concerned in the altercation was taken to the jail and, according to his testimony, was threatened by the deputy sheriff and jailor with *mob* violence unless he told them where the relator was. "They told me, 'If the Bowman crowd gets Thomas they will kill him.' and if they don't get Thomas they will handle me for Thomas."

The Solicitor General of the Northern Judicial Circuit who is the prosecuting attorney for the county of Elbert, objected to Judge FENERTY'S sitting at the habeas corpus on the ground that he was disqualified by reason of the fact that when a member of Congress he had "sponsored Anti-lynch legislation[3] and if he is sold on the subject we believe he would be biased against the State of Georgia."

This strange attitude of the prosecuting attorney towards lynching and mob violence, no doubt, played a part in the judge's decision, for in his opinion he said, inter alia; "In view of the attitude expressed by the prosecuting attorney of the State of Georgia, what becomes of the 'presumption' or 'assumption' that the accused will be granted a fair and impartial trial and will

---

[3] Judge FENERTY stated in his opinion that "while a member of the House of Representatives of the United States Congress, the hearing judge introduced a bill in that Chamber to penalize the legal authorities of any community wherein a 'lynching' occurred, if such illegal act were preventable."

be protected from mob violence? There can be no presumption of protection for the accused from murderous violence when the prosecuting attorney—charged with the duty of insuring this protection—expresses such bias and prejudice. A presumption of this kind, no matter how strong, cannot survive against the overwhelming force of known facts ...... The legal field of inquiry to which we are confined by reason of the presumption of the protection of the accused in the demanding state is, therefore, no longer circumscribed ...... In the absence of this presumption, we are free to act, for we cannot blindly consider as existent a presumption which, in the minds of reasonable men, has been rendered lifeless by those who are themselves responsible for its vitality. We feel that the prosecuting authorities of the State of Georgia have created a most serious doubt that the life of the accused will be properly safeguarded, and that there will be a regular and orderly administration of justice. Any suggestion—no matter how slight—from the prosecuting authority itself which reasonably impels us to conviction that it may not enforce with scrupulous determination and even-handed justice the law against murder, —which is the correct name for 'lynching',—can be met only by such action of this court as will protect the petitioner from probable mob violence or death."

It appearing, therefore, that the hearing judge had jurisdiction, that the proceedings were regular and in conformity with law, and that the order is supported by substantial, competent evidence, the appeal must be dismissed.

Appeal dismissed.

Judge RENO took no part in the hearing or decision of this case.