MADALYN MURRAY AND WILLIAM J. MURRAY *v.*
JOHN A. BURNS, GOVERNOR OF HAWAII, AND
DAN LIU, CHIEF OF POLICE OF THE CITY AND
COUNTY OF HONOLULU.

No. 4468.

AUGUST 18, 1965.

CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.,
AND CIRCUIT JUDGE KING ASSIGNED BY REASON OF
ILLNESS OF TSUKIYAMA, C.J.

OPINION OF THE COURT BY CASSIDY, J.

This is an appeal from an order of the Circuit Court denying a petition for a writ of habeas corpus filed by the appellants, Madalyn Murray and her son William Murray, against the Governor of Hawaii and the Chief of Police of Honolulu. The order required the delivery of the two petitioners to named agents of Maryland for return to that State in accordance with the rendition warrants issued by the Governor of Hawaii in response to a requisition of the Governor of Maryland for extradition of Mrs. Murray and her son to answer several criminal charges of assaulting police officers and interfering with the performance of their duties, pending against each under indictments returned by a grand jury convened in the City of Baltimore.

Petitioners present as the basis of their appeal and grounds for reversal the following three points:

Point (1) "Petitioners fled Maryland in fear of their lives after suffering irreparable harm and that if they are returned to that state, they will probably suffer irreparable harm in the form of physical violence and possibly death before they could be afforded judicial relief."

Point (2) "The indictments upon which the requisitions are predicated are constitutionally invalid because persons holding the same theological views as petitioners are mandatorily excluded from grand jury service by [Article 36 of] the Declaration of Rights of the Constitution of Maryland."[1]

Point (3) "Subjecting petitioners to trial in Maryland would inevitably deprive them of equal protection and due process of law as guaranteed by the United States Constitution, because persons holding the same theological views as petitioners are mandatorily excluded [by Articles 36 and 37 of the Declaration of Rights] from service as judge, juror, or witness."[2]

---

[1] Article 36 of the Declaration of Rights of the Maryland Constitution provides: "That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; *nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief; provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.*" (Emphasis added.)

[2] Article 37 of the Maryland Declaration of Rights reads: "That no religious test ought ever to be required as a qualification for any office of profit or trust in this State, *other than a declaration of belief in the existence of God;* nor shall the Legislature prescribe any other oath of office than the oath prescribed by this Constitution." (Emphasis added.)

In the development of argument on Point (2), petitioners also assert, as they allege in their petition, that the indictments upon which the extradition is sought are "void, invalid and unconstitutional in that they were issued by a Grand Jury (of the City of Baltimore, State of Maryland) from which persons holding the same religious views as petitioners were and are systematically excluded."

The allegations of the petition pertinent to Point (1) in essence are: That because of their religious beliefs,[3] and instigation of litigation respecting the separation of State and Church under the First Amendment of the Federal Constitution,[4] petitioners have been subjected to "massive contempt, ridicule, hatred, vilification, affronts, scorn and oppression by the entire community of the City of Baltimore and throughout the entire State of Maryland; have been subjected to overwhelming abuse and criticism at the hands of all communication media throughout the State of Maryland so that at the present time there exists within the State of Maryland and particularly within the City of Baltimore virtually complete public hysteria directed against them and their efforts" and that by reason thereof they would not be able to obtain a fair trial in Baltimore nor anywhere within the State of Maryland on the charges pending against them upon which the extradition is based. They also allege that, "Both petitioners are in fear of their lives if returned to Maryland," that they have received hundreds of letters threatening their lives, and that petitioner, William Murray, has been assaulted and beaten by citizens of Baltimore hundreds of times because of his reli-

---

[3] Petitioners are avowed atheists.

[4] Petitioners brought a suit to bar the practice of reading the Bible and reciting the Lord's Prayer in opening exercises in the Public Schools of Baltimore. They lost in the Maryland courts (*Murray* v. *Curlett*, 228 Md. 239, 179 A.2d 698) but prevailed on appeal to the United States Supreme Court as appears in the opinion reported with *Abington School Dist.* v. *Schempp*, 374 U.S. 203.

gious views. It is further alleged that the institution of the criminal charges against the petitioners was motivated by reason of their religious views in an effort to punish them therefor and to deter them from maintaining their pending suit to declare void tax exemptions granted religious organizations or future suits involving separation of Church and State.

As petitioners argue that if they are not ordered discharged by this court the cause should be remanded to permit them to make proof of their charges of past and prospective abuse and denial of constitutional rights in Maryland, we will briefly review the manner in which the proceedings were presented and conducted below.

The petitioners were arrested on the Governor's warrants at 9:00 A.M. on August 18, 1964. Their joint petition for habeas corpus was filed two minutes thereafter. Although no writ or order to show cause was obtained, the case was called in the trial court within 25 minutes after the filing of the petition. Counsel appeared with Madalyn Murray and William Murray and upon the call of the case announced he was ready for the petitioners. The deputy attorney general in charge of the respondents' case advised the court that counsel for the Murrays had agreed to stipulate that they were the persons named in the indictments and also that they were present in Maryland on June 20, 1964, the date alleged in the indictments. Counsel for the petitioners confirmed and agreed to such a stipulation. The deputy attorney general put in evidence, without objection, all of the documents underlying the issuance of the rendition warrants. Respondents then rested.

Neither petitioner was called to the stand and no evidence was presented on their behalf. Their counsel argued in opposition to the validity of the extradition process on the three grounds above stated. In respect to Point (1), which we are now considering, he elaborated to the extent

of asserting that the two Murrays were involved in juvenile proceedings pertaining to William Murray and his 17-year-old bride in which they were found guilty of contempt *in absentia* with Mrs. Murray being sentenced to pay a fine of $500 and serve a jail term of one year and William Murray sentenced to six months in jail. Counsel reiterated that petitioners were, and if returned to Baltimore would be, in fear of their lives. He stressed that the atmosphere of Baltimore, from which he said he had recently returned, and the entire State of Maryland is so poisoned with hatred, venom, vindictiveness and oppression that it would be impossible for his clients to receive a fair trial in Baltimore or anywhere else in Maryland. He represented, in relation to the charge that the entire State of Maryland and its people were out to punish petitioners for their religious beliefs and to deter them from their present church-tax-separation suit, that shortly after Mrs. Murray arrived in Honolulu she received a notice that the fire insurance policy on her home had been cancelled and that two days later she received another letter from the bank holding the mortgage on the premises stating that because of the violation of the insurance covenant in the mortgage the bank would find it necessary to immediately foreclose. Otherwise the recital of purported facts made by counsel in his argument was substantially the same as that set out in the petition.

While counsel for petitioners stated during the course of his argument that he was "supposed" to either take depositions or bring witnesses from Maryland in support of the allegations made in the petition and that petitioners would like to have a full-blown hearing to prove or corroborate the allegations of the petition, he eventually agreed to submit the matter on the petition and argument by stating, "[W]e have filed a petition, we have made an argument which Your Honor has been kind enough to construe

it [sic] as an offer of proof, and I will accept that for the record. Unless I get an indication from Your Honor or Counsel, we will stand on our petition and our offer of proof on argument made." This was accepted by the court and opposing counsel and after further argument the court rendered an oral decision dismissing the petition, stating in part: "Now it may be that they did have fear of their lives when they left Maryland, and it may be that they are in fear for their lives and safety if they return to Maryland but whether anybody in Maryland will do them harm or not is a matter of speculation. So this ground does not appear to be a valid ground in support of the petition."

On the state of the record as shown above, we think the petitioners are precluded from claiming that they should now be afforded an opportunity to adduce evidence in support of the allegations of their petition. We further conclude that the trial court was correct in holding to the effect that the allegations pertaining to Point (1), as supplemented by the offer of proof, were insufficient to constitute valid grounds for issuance of the writ. See *Commonwealth ex rel. Mills* v. *Baldi,* 166 Pa. Super. 321, 70 A.2d 439. There is a fundamental reason why petitioners cannot prevail on this aspect of the case.

All law on interstate extradition stems from Article IV, Section 2 Clause 2 of the United States Constitution, reading: "A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

The constitutional mandate for extradition is implemented by 18 U.S.C. § 3182, which provides that: "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which

such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged." Comparable provisions are found in the Uniform Criminal Extradition Act, which has been adopted in this jurisdiction and appears in R.L.H. 1955 as Chapter 250.

The general rule is that in habeas corpus proceedings to resist interstate extradition the scope of review in a court of the asylum state is limited to the determination of the identity of the named fugitive, whether he has been substantially charged in accordance with the laws of the demanding state and whether he was in the demanding state on the date of the offense charged.

In *Biddinger* v. *Commissioner of Police,* 245 U.S. 128, 135, it is stated:

"* * * This much, however, the decisions of this court make clear; that the proceeding is a summary one, to be kept within narrow bounds, not less for the protection of the liberty of the citizen than in the public interest; that when the extradition papers required by the statute are in the proper form the only evidence sanctioned by this court as admissible on such a hearing is such as tends to prove that the accused was not in the demanding State at the time the crime is alleged to have

been committed; and, frequently and emphatically, that defenses cannot be entertained on such a hearing, but must be referred for investigation to the trial of the case in the courts of the demanding State."

The general rule is given in *Johnson* v. *Matthews*, D.C. Cir., 182 F.2d 677,[5] at 679, as follows:

"*Habeas corpus* is the proper process for testing the validity of the arrest and detention by the authorities of the asylum state for extradition purposes. But a petition for a writ for that purpose tests only that detention; it does not test the validity of the original or the contemplated incarceration in the demanding state. The Supreme Court has established the scope of the extradition inquiry and the issues which are presented by it. The state cases and other federal court cases upon the subject are myriad. In essence the rule is that the court may determine whether a crime has been charged in the demanding state, whether the fugitive in custody is the person so charged, and whether the fugitive was in the demanding state at the time the alleged crime was committed."

The identity of the petitioners and their presence in Maryland on the date of the commission of the offenses charged against them were stipulated below. In this court, it was conceded that the indictments charged extraditable offenses. This leaves then for consideration on this phase of the case the question of whether charges of past or prospective physical injury, improper motivation for prosecution of the fugitives or a claim that a fair trial may not be had in the demanding state are sufficient to thwart extradition.

Since interstate extradition is governed primarily by the above quoted provisions of the United States Constitu-

---

[5] *Cert. denied*, 340 U.S. 828.

tion and federal statute, we necessarily must look to and are bound by the decisions of the United States Supreme Court in determining this case. *People ex rel. La Rue* v. *Meyering,* 357 Ill. 166, 191 N.E. 318, 319. The three decisions of the Supreme Court reviewed below in our opinion point out conclusively the answer to the question we are now considering.

In *Marbles* v. *Creecy,* 215 U.S. 63, 69, it is stated:

"The other question to be noticed is that raised by the following averments in the application for the writ of *habeas corpus:* 'Your petitioner further states that he is a negro, and that the race feeling and race prejudice is so bitter in the State of Mississippi against negroes that he is in danger, if removed to that State, of assassination and of being killed, and that he cannot have a fair and impartial trial in any of the courts of that State, and that to deliver him over to the authorities of that State is to deprive him, as a citizen of the United States and a citizen and resident of the State of Mississippi, of the equal protection of the laws.' It is clear that the executive authority of a State in which an alleged fugitive may be found, and for whose arrest a demand is made in conformity with the Constitution and laws of the United States, need not be controlled in the discharge of his duty by considerations of race or color, nor by a mere suggestion—certainly not one unsupported by proof, as was the case here—that the alleged fugitive will not be fairly and justly dealt with in the State to which it is sought to remove him nor be adequately protected, while in the custody of such State, against the action of lawless and bad men. The court that heard the application for discharge on writ of *habeas corpus* was entitled to assume, as no doubt the Governor of Missouri assumed, that the State demanding the arrest and delivery of the accused had no

other object in view than to enforce its laws, and that it would, by its constituted tribunals, officers and representatives, see to it not only that he was legally tried, without any reference to his race, but would be adequately protected while in the State's custody against the illegal action of those who might interfere to prevent the regular and orderly administration of justice."

In *Dye* v. *Johnson*, 338 U.S. 864, the brief ruling of the court in a per curiam opinion was, "The petition for writ of certiorari is granted and the judgment is reversed. *Ex parte Hawk*, 321 U.S. 114."[6] The significance of this holding becomes apparent when it is considered that the decision which the Supreme Court reversed, that of the Third Circuit in *Johnson* v. *Dye*, 175 F.2d 250, had in turn reversed the district court's ruling[7] dismissing an application for a writ of habeas corpus brought by a fugitive from a chain gang in Georgia who had made proof in the district court in support of his allegations that he had been cruelly treated and if he were returned to Georgia by the rendition warrant issued by the Governor of Pennsylvania he would be subject to further torture. The fugitive's petition alleged, "There is danger that he will meet his death by mob violence or be so brutalized and tortured by his jailors that he will succumb."

Whatever may have been left to inference in the Supreme Court's ruling in *Dye* v. *Johnson* was expressly ruled on in *Sweeney* v. *Woodall*, 344 U.S. 86, *rehearing denied* 344 U.S. 916.

Woodall was an escapee from an Alabama chain gang.

---

[6] In *Ex parte Hawk* the court denied, without prejudice, a state prisoner's application for habeas corpus presented on the ground that the applicant had been deprived of constitutional rights in the state trial resulting in his conviction and sentence. The denial was on the basis that it did not appear that the applicant had exhausted his remedies under the state law.

[7] *Johnson* v. *Dye*, W.D. Pa., 71 F. Supp. 262.

He was apprehended in Ohio on a rendition warrant. Claiming violation of his constitutional rights in Alabama, he sought habeas corpus in the courts of Ohio but was unsuccessful. *In re Woodall,* 88 Ohio App. 202, 89 N.E.2d 493. The Ohio Court of Appeals held, "If the constitutional rights of a prisoner are being violated in the sister State, such question should be presented by proper proceedings to the courts of that State for remedy." An appeal to the Ohio Supreme Court was dismissed. 152 Ohio St. 368, 89 N.E.2d 494. The United States Supreme Court denied certiorari. 339 U.S. 945.

Woodall next filed a petition for habeas corpus in the Federal District Court for the Northern District of Ohio. Relief was denied in that court. On appeal, the Sixth Circuit Court reversed the district court's ruling and remanded the cause for taking of evidence on the allegations of the petition. *Woodall* v. *Sweeney,* 6 Cir., 194 F.2d 542. Certiorari was granted and the Sixth Circuit's ruling was reversed in *Sweeney* v. *Woodall,* 344 U.S. 86. It appears from the opinion of the Supreme Court that the petitioner alleged "that during his confinement in Alabama he had been brutally mistreated, that he would be subjected to such mistreatment and worse if returned." (p. 87.) In reversing the Circuit Court of Appeals and reinstating the district court's dismissal of the petition for habeas corpus, the Supreme Court stated, at 89:

"Respondent makes no showing that relief is unavailable to him in the courts of Alabama. * * *

"* * * The scheme of interstate rendition, as set forth in both the Constitution and the statutes which Congress has enacted to implement the Constitution, contemplates the prompt return of a fugitive from justice as soon as the state from which he fled demands him; these provisions do not contemplate an appearance by Alabama in respondent's asylum to defend

·against the claimed abuses of its prison system. Considerations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by Alabama in the courts of that State. Respondent should be required to initiate his suit in the courts of Alabama, where all parties may be heard, where all pertinent testimony will be readily available and where suitable relief, if any is necessary, may be fashioned."

We think the foregoing decisions of the United States Supreme Court can only be taken to mean that the petitioners' allegations and offer of proof in this case of both past and prospective abuse and physical mistreatment in Maryland presented matters which the court below could not properly consider in ruling on their petition for habeas corpus. See *Johnson* v. *Matthews, supra,* D.C. Cir., 182 F.2d 677, *cert. denied,* 340 U.S. 828; *Davis* v. *O'Connell,* 8 Cir., 185 F.2d 513; *Ross* v. *Middlebrooks,* 9 Cir., 188 F.2d 308; *Commonwealth ex rel. Brown* v. *Baldi,* 378 Pa. 504, 106 A.2d 777; *Koch* v. *O'Brien,* 101 N.H. 11, 131 A.2d 63. As in *Sweeney* v. *Woodall,* petitioners make no showing that relief from the alleged abuse and physical mistreatment is unavailable in the courts of Maryland. There will be available to them there not only the state courts but also the federal courts.

As a corollary of the foregoing, petitioners' contention that the charges against them were instituted through improper motives also affords no basis for relief against extradition. In *Drew* v. *Thaw,* 235 U.S. 432, 439, it is said:

"* * * In extradition proceedings, even when as here a humane opportunity is afforded to test them upon *habeas corpus,* the purpose of the writ is not to substitute the judgment of another tribunal upon the facts or the law of the matter to be tried. The Constitution says nothing about *habeas corpus* in this connection, but

peremptorily requires that upon proper demand the person charged shall be delivered up to be removed to the State having jurisdiction of the crime. Article 4, § 2. *Pettibone* v. *Nichols,* 203 U.S. 192, 205. There is no discretion allowed, no inquiry into motives. * * *"

See also *Commonwealth ex rel. Bucksbarg* v. *Good,* 162 Pa. Super. 557, 562, 58 A.2d 842, 844; *Ex parte Wallace,* 38 Wash. 2d 67, 68, 227 P.2d 737, 738; *People ex rel. Carr* v. *Murray,* 357 Ill. 326, 332, 192 N.E. 198, 200.

The same is also true in respect to the allegations of the petition and the offer of proof that petitioners by reason of purported public animosity against them in Baltimore and the State of Maryland would not be able to have a fair trial if returned to that State. See *Marbles* v. *Creecy, supra,* 215 U.S. 63; *People* v. *Enright,* 117 Misc. 448, 191 N.Y.S. 491, 493; *Powell* v. *Meyer,* 23 N.J. Misc. 222, 43 A.2d 175; *United States ex rel. Brown* v. *Cooke,* 3 Cir., 209 Fed. 607, *appeal dismissed,* 238 U.S. 613.

Petitioners recognize the impact of the Supreme Court's rulings in *Dye* v. *Johnson* and *Sweeney* v. *Woodall* but suggest that they should be deemed outmoded by *Fay* v. *Noia,* 372 U.S. 391, and that by reason thereof this court is in a position to and should adopt the "enlightened view" of *Commonwealth ex rel. Mattox* v. *Superintendent,* 152 Pa. Super. 167, 31 A.2d 576. In making this argument petitioners quote a number of passages from and practically adopt as their bible an article in 74 Yale L.J. 78 entitled "Extradition Habeas Corpus." In the article, which thoroughly reviews, and comments on, a wide range of authorities on extradition habeas corpus, the author severely criticizes the United States Supreme Court's *Dye* v. *Johnson* and *Sweeney* v. *Woodall* decisions and in effect predicts that in view of *Fay* v. *Noia,* future decisions of that court will liberalize and extend the scope of review of federal courts in extradition habeas corpus cases.

The gist of the *Mattox* decision (31 A.2d 576) appears at p. 580, as follows:

"* * * [T]hat where the judge granting the writ of habeas corpus is satisfied by substantial and competent evidence that the feeling against the relator and the attitude of the prosecuting and peace officers of the demanding state is such as to furnish reasonable grounds for the belief that he will not receive a fair and impartial trial and is in grave peril of being lynched or abused by mob action, he may discharge him from custody and refuse to deliver him over to the representatives of the demanding state. * * *"

Petitioners recognize that the *Mattox* case no longer represents the law in Pennsylvania. However, they qualify the recognition by stating, "Although subsequent Pennsylvania decisions have somewhat 'emasculated,' without mentioning, the *Mattox* case, *Commonwealth ex rel. Brown* v. *Baldi,* 378 Pa. 504, 106 A.2d 777 (1954) (Musmanno, J. dissenting), *cert. denied* 348 U.S. 939, 75 S.Ct. 360, 99 L.Ed. 735, *rehearing denied* 348 U.S. 977, 75 S.Ct. 536, 99 L.Ed. 761; *Extradition Habeas Corpus,* 74 Yale [L. Rev.] 78, 117 (1964), the *Mattox* case has never been overruled." We are unable to see any justification for the qualification.

In *Brown* v. *Baldi, supra,* the fugitive had been arrested on a warrant of the Governor of Pennsylvania for return to Georgia where he had escaped from imprisonment. The petition for habeas corpus filed in a Pennsylvania court alleged that during his imprisonment in Georgia he had been subject to cruel and unusual punishment in violation of his constitutional rights and if returned there would again be subject to such punishment. Representatives of the State of Georgia appeared in opposition on hearing of the cause and after several hearings, the trial court stated it was satisfied that the fugitive had been subject to cruel and unusual punishment and if returned to Georgia would

again likely be subject to such punishment, but dismissed the petition. The Pennsylvania Supreme Court affirmed the trial judge's holding, stating (at p. 778) :

"Notwithstanding its findings as to past facts and future probabilities the court below properly concluded that it was bound by the decisions of the Supreme Court of the United States and of this State to dismiss relator's petition, which it accordingly did.

\* \* \* \* \* \*

"The latest decision of the United States Supreme Court, and one that clearly controls the present case, was rendered in the case of *Sweeney* v. *Woodall*, 344 U.S. 86, 73 S.Ct. 139, 140, 97 L.Ed. 114. \* \* \* Relator, in the present case, tries to distinguish that decision on such grounds as that the appeal to the Supreme Court there was from proceedings in a Federal, not a State court; that the present proceedings were under the Uniform Criminal Extradition Act, not under the Federal legislation; and that the State of Georgia, unlike the State of Alabama in the *Sweeney* case, appeared in the present proceedings. These, however, are all distinctions which obviously do not affect the fundamental principles involved. No proceedings in a State court, statutory or otherwise, can conflict with, much less override, the Constitution and the laws of Congress thereunder, which are the supreme law of the land."

While the majority opinion in *Brown* v. *Baldi* did not mention the *Mattox* case, the result of the opinion was obviously the same as if it had expressly overruled *Mattox*. As is stated in the Yale L.J. article (p. 117), "This conservative import of the *Sweeney* decision soon manifested itself in a series of Pennsylvania decisions. The culmination of these cases came in *Commonwealth ex rel. Brown* v. *Baldi*, a 1954 decision in which the Pennsylvania

524

Supreme Court eliminated the last shreds of the *Mattox* broad-scope inquiry from Pennsylvania law."[8]

There is no disputing the fact that *Fay* v. *Noia* greatly broadened the post conviction jurisdiction of the federal courts to consider and grant relief to prisoners asserting deprivation of constitutional rights in trials in the state courts. Petitioners contend that the exhaustion of state remedies principle, propounded in *Ex parte Hawk* and on which the reversal in *Dye* v. *Johnson* was founded, is "a concept which has undergone radical modification in *Fay* v. *Noia*." In this they undoubtedly are not far off the mark.[9] However, as far as the exhaustion rule was concerned, *Fay* v. *Noia* involved construction of 28 U.S.C. § 2254 governing the scope of review of federal courts in post conviction habeas corpus while here, we have an entirely different federal statute (18 U.S.C. § 3182), as well as a constitutional mandate (Art. IV § 2 Cl. 2), governing, between two states, the positive right of one to demand and the corresponding obligation of the other to deliver up a fugitive from justice. Under the circumstances, we do not believe we are required or should attempt to anticipate what effect, if any, *Fay* v. *Noia* may have on *Dye* v. *Johnson* or *Sweeney* v. *Woodall* in future rulings by the Supreme Court directed to or affecting the issue of the scope of review in extradition habeas corpus in the courts of an asylum state. Any attempt on our part to do so would be pure speculation and presumptuous.

Our own judgment is in full accord with the narrow

---

[8] Subsequent Pennsylvania decisions adhering to *Commonwealth ex rel. Brown* v. *Baldi* are: *Commonwealth ex rel. Dunn* v. *Ruch*, 380 Pa. 152, 110 A.2d 240; *Commonwealth ex rel. Davis* v. *Ruch*, 380 Pa. 155, 110 A.2d 394.

[9] Mr. Justice Harlan, with whom Mr. Justice Clark and Mr. Justice Stewart joined, contended in his dissent in *Fay* v. *Noia:* "This decision, both in its abrupt break with the past and in its consequences for the future, is one of the most disquieting that the Court has rendered in a long time." 372 U.S. 391, 448.

scope of review rulings of *Sweeney* v. *Woodall, supra,* 344 U.S. 86, and *Dye* v. *Johnson, supra,* 338 U.S. 864. Apart from that, the cases, together with *Marbles* v. *Creecy, supra,* 215 U.S. 63, presently are controlling authorities on the question we are now considering and, just as the Pennsylvania Supreme Court concluded in *Commonwealth ex rel. Brown* v. *Baldi,* that it was bound by the Supreme Court's pronouncement in *Sweeney* v. *Woodall,* we also deem that we are obligated under that case, read against the background of *Dye* v. *Johnson* and *Marbles* v. *Creecy,* to hold that the allegations of the petition in this case of past and prospective irreparable injury and deprivation of constitutional rights in Maryland, as augmented by petitioners' offer of proof, present matters that could not properly be considered by the trial court in hearing and ruling on petitioners' application for a writ of habeas corpus.

Since petitioners place so much reliance on the article in 74 Yale L.J., it might be noted that, consistently with the conclusion just stated, it is said therein (p. 130):

"* * * It is now possible to make a more sophisticated application of the exhaustion principle to extradition habeas corpus. If a petitioner seeks relief on the traditional narrow-scope ground of deficiencies in the extradition procedure, his allegation goes to the power of the asylum state's governor to have him arrested. For such relief, it is appropriate that he exhaust his state remedies first. On the other hand, if he seeks relief from prospective irreparable injury, the state courts should be without power to afford it; exhaustion of state remedies would be appropriate only if he also relies upon narrow-scope grounds. Relief from prospective irreparable injury should be available only as a last resort; more conventional bases of relief, when they exist, should be exhausted first, and should be exhausted in the first instance in the state courts. *John-*

*son* v. *Dye* has this much vitality and should have no more."

Petitioners' second point is that the indictments against them are invalid by reason of the fact that persons holding the same theological views as they do were either mandatorily or systematically excluded from the grand jury that returned the indictments and therefore petitioners have been deprived of "equal protection of the laws and due process of law guaranteed them by the Fourteenth Amendment of the United States Constitution."

Petitioners' argument in the above respect in substance is, that since "they do not believe in God or in a God possessing attributes described in Article 36 of the Maryland Declaration of Rights" and since the proviso to Article 36 requires a person to so believe in order to qualify for jury service, the exclusion of atheists in the selection of the grand jury which returned the indictments in this case was in contravention of their constitutional rights and rendered the indictments void.

Petitioners contend that the situation before us is comparable to that where it has been held that mandatory or systematic exclusion of qualified persons of a particular ethnic group in the selection of grand or petit juries denies a defendant equal protection and due process of the law so that indictments found or verdicts returned by a jury so selected are invalid and will not support a conviction. The principle referred to, as far as equal protection of the law is concerned, is well established and accepted. Among other authorities cited which support petitioners' position in that respect are *Strauder* v. *West Virginia,* 100 U.S. 303; *Hale* v. *Kentucky,* 303 U.S. 613; *Hill* v. *Texas,* 316 U.S. 400; *Cassell* v. *Texas,* 339 U.S. 282; *Hernandez* v. *Texas,* 347 U.S. 475. We also accept petitioners' contention that the same principle applies where discriminatory exclusion is made on a religious basis. Such was the holding

in *Juarez* v. *State,* 102 Tex. Crim. 297, 277 S.W. 1091. That case held that a systematic exclusion of Catholics from grand jury service deprived an accused of the equal protection of the law guaranteed by the Fourteenth Amendment of the Federal Constitution, the court stating (at 1094):

"In bringing about a violation of the provisions of the Fourteenth Amendment, the state cannot do indirectly through its officers or agents that which it could not do directly by legislative act. If the Legislature of the state should pass a law saying that hereafter no man holding to the Baptist religious faith, or the Methodist religious faith, or to the Roman Catholic religious faith, should ever be permitted to serve on a grand jury in this state, and a party adhering to the religious faith so designated should claim that by such legislative act his rights under the Fourteenth Amendment had been violated, the validity of such a law could never be sustained. This, as we understand it, is what appellant alleges in his plea, except that he avers the discrimination was designedly brought about through subordinate officers and agents of the state."

In *Hernandez* v. *Texas, supra,* 347 U.S. 475, the Supreme Court set aside a criminal conviction because of a systematic exclusion of persons of Mexican descent in the selection of jury commissioners, grand jurors, and petit jurors in the county in which the defendant was indicted and tried. The Court's ruling is broad enough to indicate, as logic dictates, that the same result would obtain if the discrimination had been on a religious basis. It is stated, at 477:

"* * * Although the Court has had little occasion to rule on the question directly, it has been recognized since *Strauder* v. *West Virginia,* 100 U.S. 303, that the

exclusion of a class of persons from jury service on grounds other than race or color may also deprive a defendant who is a member of that class of the constitutional guarantee of equal protection of the laws. The State of Texas would have us hold that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment. The decisions of this Court do not support that view. And, except where the question presented involves the exclusion of persons of Mexican descent from juries, Texas courts have taken a broader view of the scope of the equal protection clause."

*Juarez* v. *Texas, supra,* is cited for the last clause in the quotation.

While we agree that systematic discrimination in the selection of a jury, grand or petit, on a religious basis is constitutionally just as impermissible as discrimination on the basis of race or color, petitioners are not in a position to urge the point at this stage. In all of the cases above referred to on discrimination in the selection of juries, the discrimination claimed was directly raised and objected to in the state court in which the defendant was being tried. Here, the attack on the indictments is made collaterally in the court of a foreign jurisdiction in an attempt to resist extradition. Consequently, consistently with and by reason of the limited scope of review available in extradition habeas corpus proceedings, the issue is one that must be left for resolution in the demanding state. That it may not be considered by a court in the asylum state is shown in the rulings made in the analogous situations presented in the two cases reviewed below.

In *Hale* v. *Crawford,* 1 Cir., 65 F.2d 739, a fugitive from Virginia sought to resist extradition from Massachusetts on the basis that the indictment found against him in Virginia was void because, as shown by an agreed statement

put in evidence, the judge presiding over the selection of the grand jury excluded from the list all persons of African descent. It was held that the matter was determinable only in the demanding state, the court stating (at p. 743) :

"Although the question of the admissibility of evidence now under consideration has not been passed upon by the Supreme Court in a rendition case, we see no reason why the reasoning applied in removal cases involving such question is not applicable in a rendition case involving the same or a like question. In removal cases the chief reason for rejection of the evidence seems to be that the matter to which it relates is one for the trial court to decide in the district to which removal is sought; it being an irregularity in the proceeding pending before that court and not a matter going to the jurisdiction of the court. Indeed it is this line of reasoning that is made use of and applied by the Supreme Court in habeas corpus proceedings brought by a person of African descent held for trial in a state court on an indictment found against him and where a like discrimination was made in the selection of the grand jury finding the indictment."

To the same effect is *People* v. *Enright, supra,* 117 Misc. 448, 191 N.Y.S. 491, in which the court states, at 493 :

"In this proceeding the court can only inquire into the questions of whether there is a sufficient charge of a crime, whether the relator is the person named in the indictment, and whether the relator was in the demanding state on the day that the crime is alleged to have been committed. No other questions can be raised or considered. Even if it be true, as asserted by relator in his traverse, that colored persons were excluded from the grand jury which found the indictment, that the relator left the state of North Carolina to escape mob

violence, and that there is danger that he will not have a fair trial if he is surrendered to the North Carolina authorities, those facts do not entitle him to relief on habeas corpus."

Moreover, even if it were assumed that the question of the composition of the Baltimore grand jury was open for consideration in this case, there is another basis requiring rejection of the contention that the indictments returned against petitioners are invalid.

In *Torcaso* v. *Watkins,* 223 Md. 49, 162 A.2d 438, a notary public appointed by the Governor of Maryland was denied a license by a county clerk because he refused to declare his belief in the existence of God as required by Article 37 of the Maryland Declaration of Rights. In sustaining the clerk's action the Maryland Court of Appeals construed the provisions of Article 37 to require a declaration of the existence of God as a condition to qualifying for public office in the State and, relying to a good extent on the pronouncement in the opinion of the Court in *Zorach* v. *Clauson,* 343 U.S. 306, at 313, that "We are a religious people whose institutions presuppose a Supreme Being," held that the requirements of Article 37 did not offend any provision of the Federal Constitution. The holding was reversed in *Torcaso* v. *Watkins,* 367 U.S. 488. The declaration required by Article 37 was held to be impermissible because it invades freedom of belief and religion guaranteed by the First Amendment and protected by the Fourteenth Amendment from infringement by the states. The Supreme Court rejected the Maryland court's view of and reliance on the *Zorach* case and, referring to its prior decision in *McCollum* v. *Board of Education,* 333 U.S. 203, stated:

"We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force

a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against nonbelievers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs. (p. 495.)

*    *    *    *    *    *

"This Maryland religious test for public office unconstitutionally invades the appellant's freedom of belief and religion and therefore cannot be enforced against him." (p. 496.)

While the religious test stricken down by the Supreme Court in *Torcaso* v. *Watkins* pertained to qualification under Article 37 of the Declaration of Rights for public office in Maryland, it is obvious that the reasoning underlying the opinion and the explicit language contained in it apply equally as well to nullify the proviso of Article 36 disqualifying atheists from jury service.

We are unwilling to entertain any imputation that the Maryland courts would deliberately disregard an authoritative ruling of the United States Supreme Court respecting the construction and application of the Federal Constitution. Pertinent here, although dictum, is the statement of the court in *Levitsky* v. *Levitsky*, 231 Md. 388, 397, 190 A.2d 621, 625: "* * * [T]he opening clause of Art. 36 appears to be no longer tenable under *Torcaso* v. *Watkins*, 367 U.S. 488 (in which Art. 37 was involved) * * *."

The decision in the *Torcaso* case was handed down by the United States Supreme Court on June 19, 1961. Indictments in this case were returned on June 26, 1964. It follows therefore that we can and are obliged to assume that there could not have been any "mandatory" exclusion of atheists in the selection of the individuals making up the grand jury which returned the indictments against the

petitioners. If verity be given to petitioners' allegations then any discrimination which occurred in that respect would have been by systematic exclusion and as we have seen, any claim by a fugitive to that effect cannot be considered in extradition proceedings.

Petitioners' argument on Point (3) is developed from the premise that Articles 36 and 37 of the Maryland Declaration of Rights "mandatorily exclude from service as judge, juror, or witness any person who does not declare a belief in the existence of God, and in the case of jurors and witnesses, a God with certain specific attributes." The contention is then made with citation of and reliance on *Strauder* v. *West Virginia, supra,* 100 U.S. 303, *Cassell* v. *Texas, supra,* 339 U.S. 282, and *Hernandez* v. *Texas, supra,* 347 U.S. 475, that such exclusion of persons of petitioners' belief from service as judge and juror and the denial of the opportunity to be witnesses on their own behalf and to summon witnesses who concur in petitioners' theological ideas lead to the inevitable inference that any trial to which petitioners would be subjected in Maryland would, under these conditions, deprive them of equal protection and due process of law. The proffered conclusion is:

"Since the instant extradition is for the purpose of judicial proceedings in the demanding state, which will inevitably, because the judicial system is so constituted, deprive petitioners of rights secured to them under the Constitution of the United States, the demanding state has forfeited any right to request the return of petitioners. The restraint of petitioners in the instant case, being predicated on an impermissible request, is illegal in that it deprives them of liberty without due process of law in contravention of the Fourteenth Amendment of the United States Constitution. *Cf. Commonwealth ex rel. Mattox* v. *Superintendent,* 152 Pa. Super. 167, 31 A.2d 576 (1943)."

It is evident the argument is at bottom but a reiteration of that offered in support of petitioners' Point (2). We find it untenable for the same reasons that we have rejected petitioners' proposals under Point (2). In brief, it is our opinion that the matters and contentions presented under Point (3) are beyond the proper scope of inquiry in an extradition habeas corpus proceeding and, further, that the speciousness of the argument in support of Point (3) plainly appears when it is considered that petitioners' claim of prospective denial of constitutional rights rests and is conditioned on the applicability of the religious tests of Articles 36 and 37 of the Maryland Declaration of Rights, which, it must be assumed, have not been sanctioned by the Maryland courts since the United States Supreme Court decided *Torcaso* v. *Watkins* in 1961.

The order dismissing the petition for habeas corpus is affirmed.

*Hyman M. Greenstein* and *Don Jeffrey Gelber* (*Greenstein, Yamane & Cowan* of counsel) for petitioners-appellants.

*Kenneth Saruwatari,* Deputy Attorney General (*Bert T. Kobayashi,* Attorney General and *Andrew S. O. Lee,* Deputy Attorney General, on the brief) for respondents-appellees.